**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 925, AFL–CIO, and its Business Manager, H. B. Roberts, Respondent.**

No. 71–2158.

United States Court of Appeals, Fifth Circuit.

May 17, 1972.

Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Harold A. Boire, Director, Region 12, N.L.R.B., Tampa, Fla., Stanley R. Zirkin, Nancy M. Sherman, N.L.R.B., Washington, D. C., for petitioner.

Frank E. Hamilton, Jr., Thomas A. Capelle, Tampa, Fla., for respondent.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

The National Labor Relations Board petitions to enforce its orders [1] finding that respondents, Local 925 of the International Union of Operating Engineers and H. B. Roberts, the business manager of the local, violated § 8(b)(2) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b)(2), and awarding backpay to discriminatee Herman Dewey Ross. Respondents do not, in the main, challenge the validity of the Board's factual findings concerning the commission of flagrant unfair labor practices against a union member. Instead, respondents have mounted an extensive procedural attack on the propriety of the backpay award. As to respondent Local 925, we find the procedural arguments to be without merit and grant the petition for enforcement. As to respondent Roberts, we remand the petition to the Board for further proceedings.

## I. Background

This case grows out of a protracted feud between business manager Roberts and a now deceased member of the local, Herman Ross. The details of this dispute have been described in two lengthy reported decisions of the Board.[2]

Local 925 operates a union hiring hall in the Tampa, Florida area and has the exclusive right to furnish operating engineers to construction sites in that locale. The union refers its members to construction jobs on the basis of seniority rosters or "out-of-work lists" maintained by the hiring hall. Business manager Roberts supervises the referral process.

Prior to his death, Herman Ross was an experienced crane and heavy equipment operator, and had been a member of Local 925 since 1951. In June, 1962, Ross unsuccessfully sought election to the post of union business manager in a campaign against the incumbent Roberts. The election was hotly contested and apparently resulted in substantial

---

1. The Board's initial Decision and Order, issued on August 25, 1965, is reported at 154 NLRB 671. The Board's decision amending this order, issued on December 11, 1967, is reported at 168 NLRB 818. The Board's Supplemental Decision and Order, issued on January 16, 1970, is reported at 180 NLRB 759.

In addition to the § 8(b) (2) violation, the 1965 Order also held that respondents had violated § 8(b) (1) (A) by fining employee Herman Ross because he filed unfair labor practices charges against respondents. Respondents do not challenge the correctness of this determination. See NLRB v. Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); Roberts v. NLRB, 1965, 121 U.S.App. D.C. 297, 350 F.2d 427.

2. 154 NLRB 671, 672–88 (1965) (trial examiner's decision); 180 NLRB 759–80 (1970) (trial examiner's supplemental decision).

animosity between Ross and Roberts. Both prior to and after the election, Roberts made numerous statements that Ross could expect no further referrals from the hiring hall. Subsequent events proved that these threats were not idle ones. The Board found that during the period from June, 1963, until April, 1965, the union, at the instigation of Roberts, engaged in a lawless course of conduct designed to deprive Ross of the benefits of union membership. During that period, respondents discriminatorily refused to refer Ross to numerous jobs and frequently walked off jobs on which Ross was employed, all in violation of § 8(b)(2) of the Act. The Board's factual findings are, with one exception, uncontested in this court.

## II. Proceedings Below

The issues raised by respondents in opposition to the petition for enforcement concern only the correctness of the Board's 1970 backpay award. In order to understand these issues, it is necessary to briefly review the history of this case before the Board.

### A. *The 1965 Hearings*

Ross filed his first unfair labor practice charge against the union on December 4, 1963, after the union had refused to refer him to a job as a crane operator with J. L. Manta, Inc. After a brief period of negotiations in January of 1964, that charge was settled. The settlement agreement provided that Ross was to be paid $200 backpay for loss of the Manta job. In addition the union agreed to refrain from similar misconduct in the future, both as to J. L. Manta, Inc., and as to any other employer. The union further agreed to post the appropriate notices of the settlement. This settlement was approved by the Regional Director on January 29, 1964.

On the date that the settlement was approved, however, the union preferred intra-union disciplinary charges against Ross. These charges alleged that Ross had violated union rules by filing an unfair labor practice charge against the

union without first exhausting internal union remedies. In response to these charges, Ross filed on February 3, 1964, a second unfair labor practice charge against the union with the Board. This second charge alleged that the bringing of intra-union charges against Ross for the reasons stated violated the Act.

At the March meeting of the union Ross was convicted of these charges and fined $1,025, which included $525 in legal fees, $200 to reimburse the union for payment of the settlement, and $300 representing one week's salary for business manager Roberts. Ross refused to pay the fine and the union thereafter on two occasions refused to accept Ross' tender of union dues.

Subsequent to the bringing of intra-union disciplinary proceedings against Ross, there followed a period of systematic hiring hall discrimination against him. In particular, between June and October, 1964, the Board found at least six instances in which the union either wrongfully refused to refer Ross to a job to which he was entitled, or walked off jobs on which Ross was working causing employers to discharge him.

Finally, on December 3, 1964, Ross again complained to the Board by amending the February 3rd charge to include all of the subsequent acts of discrimination through the date of amendment. In response to this amended charge, the Regional Director, on December 9, 1964, set aside the January 29, 1964, settlement agreement of the December 4th charge and issued an order consolidating the two charges. On the same date, the Regional Director issued a complaint and notice of hearing in the consolidated cases.

Hearings were held in the two cases from February 23 through March 2, 1965. On April 28, 1965, the Board hearing examiner issued his decision holding that respondents violated § 8(b)(1)(A) of the Act by fining Ross for filing unfair labor practice charges against the union. The examiner also found that respondents had violated §

8(b) (2) by refusing to refer Ross to numerous jobs and by causing certain employers to discharge Ross.

The earliest incident of discrimination found by the examiner was the refusal to refer Ross to a job with the Foster-Wheeler Company on July 30, 1963. No unfair labor practice charges arising after October 26, 1964, were litigated at the 1965 hearings.

On August 24, 1965, the Board issued a Decision and Order affirming the decision of the trial examiner. 154 NLRB 671. The Board's order required that respondents desist from the unfair labor practices found and from any related interference with Ross' Section 7 rights. The order affirmatively required backpay for any loss of wages resulting from the discrimination and required that respondents maintain permanent records which would disclose the basis upon which referrals were made.

After the Board's affirmance of the trial examiner's decision, the Regional Director and the union engaged in negotiations concerning the scope of respondents' liability for backpay. Unable to agree, the Board filed on October 24, 1966, a petition with this court for enforcement of its order. However, on January 9, 1967, the Board voluntarily withdrew its petition for enforcement without prejudice.

### B. The 1967 Amendment of the Board's Original Order

On February 17, 1967, the Regional Director issued a backpay specification and notice of hearing claiming liability for backpay from the date of the first discrimination against Ross (the Foster-Wheeler incident on July 30, 1963) and continuing indefinitely into the future "until Respondents comply with the Board's Order". Respondents filed a motion to strike that portion of the backpay specification which asserted backpay liability for events occurring after the last unfair labor practice litigated during the 1965 hearings. The trial examiner granted this motion and entered an order confining the backpay proceeding to determination of liability only for those acts determined to be unfair labor practices by the Board in its original order. The trial examiner reasoned that the Board's original order did not authorize a determination of backpay beyond the specific events found to be unfair labor practices.

In response to the trial examiner's ruling, the Board on June 21, 1967, issued a notice to show cause why the original order should not be amended to include backpay reimbursement for any discrimination against Ross occurring after October 26, 1964. On December 11, 1967, the Board issued an amended order requiring respondents to make Ross whole for any loss of pay from the date "such discrimination began until such time as the discrimination ceases or has ceased and Respondent fully complies or has complied with the Board's order". 168 NLRB 818.

### C. The 1968 Backpay Hearings

Pursuant to this amended order, the trial examiner reinstated the provisions of the backpay specification relating to conduct occurring after October 26, 1964. Backpay hearings were held on various dates from May 7 to November 13, 1968. On June 11, 1969, the trial examiner announced his decision awarding to Ross a total of $14,762.68 backpay.

The trial examiner calculated backpay in the following manner:

1. For the period from July 30, 1963, to December 2, 1963, the examiner used the earnings of Eddie McCrae, the crane operator referred to the Foster-Wheeler job instead of Ross, to calculate gross backpay. Deducted from this amount were wages actually earned by Ross and amounts earned by McCrae during periods when Ross was unavailable for work due to disability.

2. For the period from December 4, 1963, to January 10, 1965, the wages of Herman Lucas, the individual who was wrongfully referred to the J. L. Manta, Inc., job in place of Ross, were utilized

to determine gross backpay. Deducted from this amount were Ross' actual earnings during the period.

3. For the period from January 11, 1965, until June 30, 1965, the examiner computed gross backpay on the basis of the average earnings of a "representative" group of 22 expert crane operators.

The examiner found that all acts of discrimination against Ross ceased on April 30, 1965. On that date, the union's attorney advised the membership to refrain from any further discrimination against Ross and respondents apparently heeded this admonition. Backpay liability was calculated through June 30, 1965, the termination date of the last job of which Ross was deprived. The examiner assessed liability for backpay against both the union and Roberts personally. The Board entered an order affirming the trial examiner's determination of backpay dated January 16, 1970. 180 NLRB 759.

The Board's petition seeks enforcement of both the 1965 and 1970 orders. Insofar as we can determine, respondents do not contest the validity of the 1965 order, but oppose virtually every aspect of the 1970 backpay award. For purposes of discussion, the backpay order will be considered under the three categories mentioned above.

### III. Backpay for the Foster-Wheeler Job

The first element of backpay found by the trial examiner covering a period from July 30, 1963, to December 2, 1963, was based upon respondents' refusal to refer Ross to the Foster-Wheeler job and the referral of Eddie McCrae to that job instead. Respondents urge that enforcement should be denied as to this element of the backpay award because liability is barred by the six months' limitation provision of § 10(b) of the Act.[3] We disagree.

The failure to refer Ross to the Foster-Wheeler job was the first act of discrimination against Ross and occurred on July 30, 1963. Ross filed his first unfair labor practice charge against respondents on December 4, 1963. The December 4th charge alleged that the union had violated § 8(b) (2) by discriminatorily refusing to refer Ross to the "Manta" job on about December 2, 1963. The charge also included a general allegation that "by other acts and conduct, the above named labor organization ⁙ * * restrained and coerced prospective employees of Manta Corporation and of other employers in the exercise of the rights guaranteed in Section 7 of the Act". Thus, while this charge was made within six months of the Foster-Wheeler referral, it did not explicitly make reference to that incident.

On February 3, 1964, Ross filed his second unfair labor charge against the union. This charge alleged that the union violated § 8(b)(1)(A) by subjecting Ross to intra-union disciplinary proceedings because he resorted to Board procedures. This charge likewise made no reference to the Foster-Wheeler referral.

On December 3, 1964, the February 3rd charge (second charge) was amended to include § 8(b)(2) allegations that the union had caused or attempted to cause discrimination against Ross by employers other than Manta. The amended charge specifically named six employers including the Foster-Wheeler Company. Shortly thereafter, the two cases were consolidated for hearing and a complaint issued which alleged that respondents' failure to refer Ross to the Foster-Wheeler job on July 30, 1963, was a violation of § 8(b)(2) of the Act.

Respondents correctly argue that the allegations in the complaint concerning the Foster-Wheeler job could not properly issue if based solely on the second amended charge which explicitly makes reference to the Foster-Wheeler job. Even assuming that the amendments to the second charge "relate back" to the initial filing date of the second charge

3. 29 U.S.C. § 160(b).

(February 3, 1964), the Foster-Wheeler referral occurred more than six months prior to that date and thus would be barred by § 10(b).

However, we conclude, for reasons set out below, that the complaint did properly include the Foster-Wheeler referral because that act of discrimination bore a sufficiently close relationship to the acts alleged in Ross' original December 4, 1963, charge to support the complaint. Since the Foster-Wheeler incident occurred less than six months before the December 4th charge, there was no violation of the § 10(b) limitation.

■■ Section 10(b) provides generally that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *". However, in construing this provision, courts have almost uniformly held that it does not require that the charge specify every unfair labor practice to be litigated. As this court observed in Texas Industries, Inc. v. N. L. R. B., 336 F.2d 128, 132 (1964):

> It is established that [§ 10(b)] precludes the Board from issuing a complaint on its own initiative, and that a charge is a prerequisite to the institution of proceedings before the Board. N. L. R. B. v. Kohler Co., 7 Cir. 1955, 220 F.2d 3. However, the charge is not a formal pleading and its function is not to give notice to the respondent of the exact nature of the charges against him. N. L. R. B. v. Fant Milling Co., 1959, 360 U.S. 301, 79 S. Ct. 1179, 3 L.Ed.2d 1243; Consumers Power Co. v. N. L. R. B., 6 Cir. 1940, 113 F.2d 38. This is the function of the complaint. The charge rather, serves merely to set in motion the investigatory machinery of the Board. It is largely for the benefit of the Board, not the respondent, so that it may intelligently determine whether and to what extent an investigation is warranted. Consequently, the Board has considerable leeway to found a complaint on events other than those

> specifically set forth in the charge, the only limitation being that the Board may not get "so completely outside * * * the charge that it may be said to be initiating the proceeding on its own motion * * *".

Thus, it is settled that the Board complaint may enlarge upon the charge filed by the aggrieved individual to include allegations of other unfair labor practices which occurred within six months prior to the filing of the charge subject only to the restriction that the additional allegations be "closely related" to the events complained of in the charge, and be "of the same class" as the practice described in the original charge. See Douds v. International Longshoremen's Ass'n, 2 Cir. 1957, 241 F.2d 278; N. L. R. B. v. Westex Boot & Shoe Co., 5 Cir., 190 F.2d 12, 13–14; Texas Industries, Inc. v. N. L. R. B., supra. After examining this record, we conclude that the Foster-Wheeler incident bears a sufficiently close connection to the Manta referral to warrant its inclusion in the complaint. Both incidents involved refusals to refer Ross to a job to which his position on the "out-of-work" list entitled him. Both referrals were closely connected in time. In each case the refusal to refer was motivated by Roberts' continuing desire for reprisal against Ross. The December 4th charge adequately informed respondents that their referral practices as to Ross had been challenged. It does not violate the purposes of § 10(b) to permit the Board to include in its complaint allegations of other instances in which respondents refused to refer Ross to a job in addition to the particular incident giving rise to the charge.

### IV. Backpay for the Manta Job

The second element of backpay found by the trial examiner was based on respondents' refusal to refer Ross to a job as an overhead crane operator for J. L. Manta, Inc., to begin work on December 2, 1963. Union member Herman Lucas was referred to the job instead. The hearing examiner used the earnings of

Lucas as the yardstick for determining the earnings Ross would have received but for the discrimination of respondents. Lucas was employed on the Manta job from December 2, 1963, until January 10, 1965.

Respondents no longer challenge the Board's finding that the refusal to refer Ross to the Manta job violated § 8(b)(2). They do, however, raise numerous contentions concerning the correctness of the backpay award stemming from the Manta incident.

■ a. Respondents' initial contention is that the Board had no power to set aside the September 29, 1964, settlement agreement which fixed respondents' backpay liability for the Manta referral at $200. They contend that "a settlement agreement, once executed, normally constitutes binding satisfaction of backpay claims even though the agreement is later set aside for noncompliance with its desistance portion".

■ We find this argument totally without merit. It is well settled that the Board has broad power to reopen settlement agreements where post-agreement unfair labor practices have occurred. As the Supreme Court said in Wallace Corporation v. N. L. R. B., 323 U.S. 248, 254, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944):

> [T]he Board * * * ordinarily will respect the terms of a settlement agreement approved by it. It has consistently gone behind such agreements, however, where subsequent events have demonstrated that efforts at adjustment have failed to accomplish their purpose, or where there has been a subsequent unfair labor practice. We think this rule adopted by the Board is appropriate to accomplish the Act's purpose with fairness to all concerned.

It will be recalled that Ross filed an unfair labor practice charge with respect to the refusal to refer him to the Manta job on December 4, 1963. During January 1964, negotiations took place between Ross and the union with respect to this charge. The settlement was reached, and on January 29, 1964, the Regional Director approved the settlement agreement. In addition to backpay, the agreement required that respondents desist from any similar future misconduct and post notices to that effect.

The settlement was, however, short-lived. On the day of the settlement, intra-union disciplinary charges were preferred against Ross to punish him for having resorted to Board procedures. In the months that followed, Ross was subjected to numerous incidents in which respondents either refused to refer him to a job or walked off jobs on which he was working. The settlement agreement was finally reopened on December 9, 1964, after it had become abundantly clear that respondents' conduct was in flagrant violation of the terms of the agreement.

Respondents rely heavily on the fact that there were no subsequent § 8(b)(2) violations *as to the J. L. Manta company*. We deem this fact of little consequence. In the context of a union hiring hall where employees are referred to numerous employers for jobs of short duration, a promise not to discriminate in referrals as to any single employer is virtually meaningless. Under the settlement agreement, respondents agreed to refrain from "causing or attempting to cause the J. L. Manta, Inc., or *any other employer* to refuse employment" to Ross. Respondents failed to abide by both the letter and spirit of this agreement. The Board was fully justified in setting aside the agreement including the backpay portion.

The two cases [4] cited by respondents for the proposition that it is "established Board policy not to disturb the

4. Local 269, Internat'l. Bro. of Electrical Workers, 149 NLRB 768, enforced NLRB v. Local 269 etc., 3 Cir., 357 F.2d 51 (1966); Jackson Tile Manufacturing Co., 122 NLRB 764, enforced 5 Cir., 272 F.2d 181 (1959).

backpay provisions of a settlement agreement even though subsequently set aside for noncompliance" simply do not support that assertion. At most these cases can be read as holding that the Board retains discretion to leave the backpay award undisturbed in the face of subsequent violations of the agreement where it appears that the backpay award still fully compensates the aggrieved employee for actual wages lost. There is simply no authority to support the broad proposition asserted that the Board is powerless to set aside a grossly inadequate backpay award in the fact of continued and flagrant violations of the agreement.

■ b. Respondents next assert that their backpay liability for the Manta incident should, in any event, have terminated on the date on which respondents advised the Manta Corporation that the union had no objection to the employment of Ross by the corporation.[5] Respondents contend that in § 8(b) (2) cases, the Board has consistently held that the labor organization's backpay liability is terminated upon the giving of such a notice even though the employee is not immediately hired by the employer. See e. g., Roadway Express, Inc., 108 NLRB 874 (1954); Local 12, Bakery and Confectionery Workers' Union, 115 NLRB 1542 (1956). This is undoubtedly a correct statement of Board policy. However, this rule is plainly inapplicable in cases such as this where the union, by its conduct subsequent to the giving of the notice, continues its discrimination against the employee. Liability for the Manta incident would have terminated with the giving of notice to Manta had respondents refrained from further discrimination

against Ross, but they did not. Precisely the same rationale which justifies the Board's setting aside of the settlement agreement also sustains the Board's refusal to toll backpay liability by reason of the mere fact that respondents furnished Manta with notice that they no longer objected to the employment of Ross.

■ c. Respondents' next contention concerning the Manta job is that notwithstanding its other arguments, its liability for backpay should have been tolled on January 27, 1964, because on that date Ross voluntarily rejected an unconditional offer of similar employment on the Manta job. Respondents rely on a letter dated January 27, 1964, from respondents' attorney in which the possibility of employment on the Manta job is discussed.

The Board contends that the offer of employment to Ross was conditioned upon withdrawal of the unfair labor practice charges and as such it was insufficient to toll backpay liability. We need not decide this question. It is clear that this letter was simply part of the negotiations which preceded the January 29th settlement agreement. It would be incongruous to hold that the Board had authority to set aside the settlement agreement and recompute backpay liability but then to seize upon an isolated piece of correspondence from the presettlement negotiations as tolling any future backpay liability. The central question here is whether the Board had authority to set aside the settlement agreement. We conclude that the Board did have this authority. Having reached this conclusion, it follows *a fortiori* that the Board properly refused to toll respondents' backpay liability because of

5. On January 15, 1964, prior to settlement of the Manta charge, respondent Roberts advised Manta Corporation that:

> This organization and its Business Representative do not have any objection whatsoever to your employment of Herman Dewey Ross. This is also to advise that Mr. Ross will be referred to you for employment if he is available for such the next time you request referral of a crane operator. Any such referral will be in strict compliance with the union's established referral procedures, all laws, and without discrimination.

On January 27, 1964, the date of settlement, respondent Roberts again furnished similar notice to Manta.

offers made during the pre-settlement negotiations.

■ d. Respondents' final contention as to the Manta job is that the earnings of Lucas are an invalid measure of the earnings Ross would have received on the Manta job because Ross' experience on the job would not have been the same as Lucas'.

Lucas was first employed on the Manta job on December 2, 1963. On December 18, 1963, Lucas was transferred from his job as a crane operator to a position operating a machine known as a wheelabrator. As a wheelabrator operator Lucas earned the same hourly rate which he received as a crane operator. On March 2, 1965, he was promoted to the position of foreman or "master mechanic" and received a 50 cents hourly wage increase. It is argued that these job changes inflated Lucas' 1964 earnings because of the increase in hourly pay and because the wheelabrator job required substantial overtime, and that these job changes would not have occurred had Ross been on the job instead of Lucas. The Board held that these changes in Lucas' job did not prevent him from serving as a fair yardstick for the wages Ross would have earned. We agree.

The only real issue here is whether the promotion to foreman makes Lucas' earnings an improper measure of backpay. The shift to the wheelabrator did not change Lucas' hourly wage rate. Respondents assert that Lucas received more overtime working on the wheelabrator, but they failed to offer any proof of the amount by which the overtime worked by Lucas exceeded the overtime worked by the other crane operators on the Manta job. Since the burden was upon respondents to make such a showing, we can only regard the assertion as being speculative. N. L. R. B. v. Brown & Root, Inc., 8 Cir. 1963, 311 F.2d 447.

Respondents assert that Lucas was promoted to foreman because of his special abilities. However, there is sub-stantial evidence in the record that the Manta company appointed a foreman only because union rules required that they have one. It is undisputed that Lucas' duties were precisely the same both before and after the promotion. The record supports the Board's finding that Lucas was selected as foreman for reasons that had no demonstrable connection to his individual abilities. Had Ross been on the job instead of Lucas, he might just as easily have been selected. We will never know for certain, but we think this uncertainty should be resolved against respondents and not against Ross. As this court had held in an analogous situation:

> when an employer's unlawful discrimination makes it impossible to determine whether * * * employee would have earned backpay in the absence of discrimination, the uncertainty should be resolved against the employer.

NLRB v. Miami Coca-Cola Bottling Co., 5 Cir., 360 F.2d 569 at 572–573. See also East Texas Steel Casting Co., Inc., 116 NLRB 1336, 1339–1340 (1956), enforced NLRB v. East Texas Steel Castings Co., 5 Cir., 255 F.2d 284 (5 Cir. 1958).

### V. Post-Manta Backpay

The last element of backpay awarded by the trial examiner covered the period from January 11, 1965, until June 30, 1965. This portion of the backpay award differs from the two previously discussed in that it is based upon conduct and events that were not determined to be unfair labor practices during the 1965 hearings. Instead, both the illegality of the conduct and the extent of backpay liability were litigated during the 1968 backpay hearings.

The trial examiner who conducted the 1968 hearings found numerous specific incidents of hiring hall discrimination during this period. However, the examiner determined that no "actual replacement" of Ross was readily identifiable. For that reason, the examiner computed gross backpay on the basis of the

average earnings of a representative group of 22 expert crane operators.

Again, respondents have raised a number of procedural objections to this portion of the backpay award. Most of the objections center around the asserted impropriety of utilizing a backpay proceeding to litigate the existence of unfair labor practices. We conclude, however, for reasons set forth below, that the 1968 hearings afforded respondents a full and fair opportunity to litigate the alleged unfair labor practices on which this element of the award is based.

■ a. On December 11, 1967, the Board amended its 1965 order to require that respondents be held liable for backpay "from the date the record herein shows such discrimination began until such time as the discrimination ceases". 168 NLRB 818. Prior to amendment, the order imposed backpay liability only through October 26, 1964, the date of the last incident litigated in the 1965 hearings.

Respondents object strenuously to this amendment of the Board's order. They contend that the amendment is based upon a finding that respondents engaged in a pattern of "continuing discrimination" which was not litigated at the 1965 hearings. We agree that no general allegation of "continuing discrimination" was made or litigated at the 1965 hearings, but this fact is irrelevant. The 1967 amendment to the Board's order was based not on the 1965 trial examiner's finding of "continuous discrimination" but on the later allegations made by Ross that respondents had continued their discrimination against him subsequent to the 1965 hearings.

It is axiomatic, of course, that a finding of "continuous discrimination" during a specified period of time will not support backpay liability for events occurring during a later time span. But the Board order did not, as respondents suggest, impose any such backpay liability. The order provided that "the General Counsel must necessarily prove that

any claimed losses of wages during the expanded backpay period resulted from discriminatory refusals to refer Ross". The examiner based his backpay award on specific instances of discrimination which he found to have occurred, not upon any finding of continuous discrimination made during an earlier hearing.

b. The 1968 backpay hearings were initiated by a backpay specification issued by the Regional Director on January 3, 1968. The specification contained, as required by Board regulations, schedules of computations showing gross and net backpay due for the unfair labor practices found during the 1965 hearings. Pursuant to the Board's amended order of December 11, 1967, the backpay specification also indicted respondents for a number of specific alleged unfair labor practices occurring subsequent to the close of the 1965 hearings. These new charges were litigated in the 1968 backpay proceedings, along with other issues relating to the proper measure of backpay for acts previously determined to be unfair labor practices. Respondents contend that they were "enormously prejudiced" by "the intermingling of backpay issues with questions pertaining to the existence of new unfair labor practices". Again, we disagree.

■ Respondents' first objection to the litigation of these new allegations at the 1968 backpay hearings is that it contravenes § 10(b) because there was never a timely filed charge as to these later events. We think this contention was disposed of by the Supreme Court in NLRB v. Fant Milling Company, 360 U. S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243. In that case, the issue was whether the Board was prevented by § 10(b) from including in a complaint allegations based upon events occurring after the filing of the charge. The court held that § 10(b) placed no such restriction on the Board. The court reasoned that Congress would never have intended that § 10(b) preclude the Board "from dealing adequately with unfair labor practices which are related to those alleged

in the charge and which grow out of them while the proceeding is pending before the Board". Id. at 360 U.S. 309, 79 S.Ct. 1184. See also National Licorice Company v. NLRB, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799. As in *Fant Milling* the events complained of in the Board's 1967 backpay specification were "related to" the allegations contained in Ross' amended charges. The specific 1967 allegations involved job walk-offs and other hiring hall discrimination against Ross. This is precisely the same class of violation as is described in Ross' original and amended charges. Moreover, the later events also clearly "gr[ew] out of [the earlier charges] while the proceeding [was] pending before the Board". Indeed, there is substantial evidence that much of the later discrimination against Ross came as reprisal for his having initiated Board proceedings against the union. Under these circumstances, § 10(b) does not require that a new charge be filed to support the later Board proceedings.

 Respondents next assert that litigation of these issues was improper because there was never a complaint issued by the Board as required by § 10(b) of the Act and by the Boards' own regulations. The Board urges that the backpay specification issued on January 3, 1968, fully meets the requirements of a complaint and should be treated as one. We agree.

 The Board's regulations require that a complaint contain:

> a clear and concise description of the acts which are claimed to constitute unfair labor practices, including, where known, the approximate dates and places of such acts and the names of respondent's agents or other representatives by whom committed. 29 C.F.R. § 102.15 (1965).

An examination of the backpay specification reveals that it contains just such a "clear and concise" statement of the alleged unfair labor practices. The specification detailed five specific incidents which were said to be unfair labor practices with the dates, names of employers, and job sites included. The specification also contained four allegations of more general discriminatory practices. While these latter allegations may well have lacked the specificity that is desirable in a complaint, there was no prejudice to respondents because the examiner found in favor of respondents on each of these points.[6]

Respondents' claim that there was no valid complaint would be wholly untenable had the Board simply captioned the document as a "Complaint and Notice of Hearing" rather than as a "Backpay Specification and Notice of Hearing". To allow substantial differences in result to flow from such a technical defect would surely be to exault form over substance. The Board's amended order informed respondents that they were charged with accountability for unfair labor practices occurring after the first hearings, but provided that "the General Counsel must necessarily prove that any claimed losses of wages during the expanded backpay period resulted from discriminatory refusals to refer Ross". The backpay specification detailed the specific allegations against respondents. The specification fully served the function of complaint; accordingly, we decline to hold that the failure to formally caption it as such is grounds for declining to grant enforcement of the backpay award.

 Respondents lastly point out that the Board regulation which authorizes "Backpay Proceedings" implies that such proceedings shall be confined solely

---

6. The examiner found certain acts of respondents to be evidence of discrimination against Ross which were not specifically alleged in the specification. However, these issues were fully litigated before the examiner. It is settled that "a material issue which has been fairly tried by the parties should be decided by the Board regardless of whether it has been specifically pleaded". American Boiler Manufacturers Ass'n v. NLRB, 8 Cir. 1966, 366 F.2d 815, 821; see also NLRB v. Puerto Rico Rayon Mills, 1 Cir., 293 F.2d 941 (1961).

602

to a determination of amounts owed in backpay for acts previously determined to be unfair labor practices.[7] We disagree. Certainly in the ordinary case, the issues will be so limited. However, we do not think that the regulation can fairly be read as prohibiting the Board from ever consolidating for one hearing questions pertaining to backpay with issues relating to the existence of unfair labor practices.

If this court were to conclude that the 1968 hearings afforded respondents an inadequate opportunity to litigate the existence of these unfair labor practices, the appropriate remedy would be to remand to the Board for further hearings. We cannot believe that any useful purpose would be served by such a decision. These hearings involved 40 days of testimony and produced 5400 transcribed pages of testimony and argument. Respondents have not suggested any respects in which they were prevented from adducing all relevant evidence on their behalf. Their position is simply that backpay should be denied because the Board improperly conducted the hearings. This is a patently untenable position.

c. Respondents' final contention as to this element of backpay is that the Board's finding of discrimination against Ross during this period is unsupported by substantial evidence in the record. In particular, respondents urge that there is no substantial evidence to support the finding that respondents

called Ross for job referrals at irregular hours, contrary to the normal procedures of the hiring hall.

The trial examiner found that the usual practice of the hiring hall was to make job referrals from 3:30 to 5:00 P. M. daily. This finding was supported by the unequivocal testimony of Ross to that effect. It was also supported by the testimony of business manager Roberts as the following colloquy from the record indicates:

Q. Except for the "at once" request, is there any particular time when you attempted to fill employer requests for operators—that is time of the day.

A. Yes, sir. Usually in the afternoon between 3:30 and 5 o'clock and sometimes its 6:30 before we get out of there.

The examiner also found that between October 28, 1964, and March 29, 1965, all of respondents' calls to Ross for job referrals were made at hours other than 3:30 to 5:00 P.M. The examiner concluded that this fact was evidence of hiring hall discrimination against Ross.

Respondents assert that Roberts' uncontradicted testimony that "sometimes its 6:30 before we get out of there" is inconsistent with the examiner's finding. We disagree. The examiner did not purport to find that no referral calls were ever made by the hall at other hours. He merely found that the preponderance of the calls were

7. 29 C.F.R. § 101.16 provides as follows:

§ 101.16 Back-pay proceedings.

(a) After a Board order directing the payment of back pay has been issued or after enforcement of such order by a court decree, if informal efforts to dispose of the matter prove unsuccessful, the regional director is then authorized at his discretion to issue a "back-pay specification" in the name of the Board and a notice of hearing before a trial examiner, both of which are served on the parties involved. The specification sets forth computations showing gross and net back pay due and any other pertinent information. The respondent must file an answer within 15 days of the receipt of the specification, setting forth a particularized statement of its defense.

(b) In the alternative and at his discretion, the regional director, under the circumstances specified above, may issue and serve upon the parties a notice of hearing only, without a specification. Such notice contains, in addition to the time and place of hearing before a trial examiner, a brief statement of the matters in controversy.

(c) The procedure before the trial examiner or the Board, whether initiated by the "back-pay specification" or by notice of hearing without a back-pay specification, is substantially the same as that described in §§ 101.10 to 101.-14.

made during that period. This fact, coupled with the fact that respondents made *not a single referral call* to Ross at this time of day during the entire five-month period, gave rise to a permissible inference of hiring hall discrimination against Ross.

 Moreover, the irregular hour referral calls were only one small element of the overall pattern of hiring hall discrimination and harassment found by the examiner to have existed during the period from October 26, 1964, until April 30, 1965. The examiner also found numerous instances in which Ross was harassed by calls offering referrals to jobs which it was known in advance he would not accept as the union rules permitted him to do. The examiner found frequent instances when Ross was discriminatorily removed from the "out-of-work" list for not "checking in". Also found were instances during this period when others were referred to jobs over Ross. Finally, there were two undisputed occasions in which union members walked off jobs on which Ross was employed resulting in his discharge. These findings of the trial examiner apparently are not disputed and would support the backpay award independently of the finding of referral calls made at irregular hours.

## VI. Personal Liability of Roberts

The Board's 1970 order assessed personal liability for backpay against union business manager H. B. Roberts. This ruling appears to be a departure from a consistently followed Board policy of not holding the agents of unions liable for backpay where the union is itself liable. See Local 420, United Association of Journeymen, etc., 111 NLRB 1126, 1127–28 (1955), enforced 3 Cir., 239 F. 2d 327; Motion Picture Operators Union of Essex County, Local 244, 126 NLRB 376, 377, n. 3 (1960); H. E.

Stoudt & Sons, Inc., 114 NLRB 838 (1955); Local 1445, International Hod Carriers, 126 NLRB 226 (1960); Local 121, Marble Polishers, Machine Operators & Helpers, 132 NLRB 844 (1961); Local 4, Hoisting and Portable Engineers, 141 NLRB 1231 (1963); United Brewery Workers, 166 NLRB 915 (1967). The Board has failed to cite a single Board decision in which a union agent was held personally liable for backpay under these circumstances.[8]

This apparent departure from prior decisions appears not to have been considered by the Board in its 1970 order. In affirming the trial examiner's supplemental decision without opinion, the Board pretermitted discussion of the issue. The examiner's supplemental decision merely acknowledged that respondents had raised the issue of Roberts' liability. The examiner made no effort to distinguish the prior Board decisions reaching an opposite result.

In its brief, the Board concedes that it "ordinarily does not hold union business agents personally liable for backpay", but seeks to justify the result in this case on the theory that Roberts did not merely implement the policy of the union, but was instead the architect of that policy. It is urged that "Roberts was the moving force behind the anti-Ross campaign and should not now be allowed to plead his representative status as a defense against the finding of personal liability". In reply, respondents cite several Board decisions in which no personal liability was imposed which are said to be factually indistinguishable from the case at bar. Particular reliance is placed on United Brewery Workers, 166 NLRB 915 (1967), a case in which the Board found the union business agent to have discriminated against several employees in the making of job referrals from the union's exclusive hiring hall in retaliation for the

---

8. The only case we have discovered in which a union business agent was clearly held personally liable for backpay was Edward G. Partin, 148 NLRB 819, (1964), enforced Partin v. NLRB, 5 Cir.,

356 F.2d 512. Significantly, in that case the union was not joined as a party. Moreover, the issue of personal liability was not raised before the Board.

employees having aided a rival union in an attempt to dissolve the union.

Respondents contend that the imposition of personal liability upon Roberts contravenes the Board's governing statutory authority.[9] However, for reasons set forth below, we need not decide that question at this time.

■■■■ It is, of course, true that the Board is free to adopt new rules of decision and that the new rules of law can be given retroactive application.[10] Nevertheless the Board may not depart sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case. Mary Carter Paint Co. v. FTC, 5 Cir., 1964, 333 F.2d 654; NLRB v. Don Juan, Inc., 2 Cir. 1949, 178 F.2d 625. As this court held in Mary Carter Paint Co. v. FTC, supra, "there may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case."[11] Here, the Board's departure from its prior rule was wholly unexplained in its decision. It is not enough, as is attempted here, that the General Counsel points out reasons— even compelling ones—which would have justified the result reached. Securities and Exchange Commission v. Chenery Corp., 1943, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626. Explanations proffered in briefs at the appellate level are not an adequate substitute for a reasoned explanation of the result reached in the decision itself. The vice of such an approach has been aptly described by a leading commentator on administrative law:

> If there is to be any measure of predictability and consistency in the process of adjudication, and if the decision maker is not free to rely on unarticulated criteria, then a change in the rule of decision in a given case should apply not only to the case at hand but to similar cases arising in the future. * * * [A]n inadequately explained departure solely for purposes of a particular case, or the creation of conflicting lines of precedent governing the identical situation, is not to be tolerated.[12]

Thus, without reaching the question of whether the Board has exceeded its statutory authority, we conclude that this

9. Respondents contend that the imposition of personal liability for backpay against the agents of a union is contrary to § 10(c) of the Act, 29 U.S.C. § 160(c), which provides:

> If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act: *Provided*, that where an order directs reinstatement of an employee, *back pay may be required of the employer or labor organization*, as the case may be, responsible for the discrimination suffered by him. (Emphasis supplied)

Respondents urge that the proviso in § 10(c) reflects congressional intent that liability for backpay be restricted to employers and labor organizations and not extend to individual employees and union members personally.

It is also contended that § 10(c) should be interpreted in light of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, which explicitly provides that:

> any money judgment against a labor organization in a district court * * * shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.

10. FCC v. WOKO, Inc., 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946); see generally, Note, Judicial Review of Reversals of Policy by Administrative Agencies, 68 Harv.L.Rev. 1251 (1955).

11. 333 F.2d at 660 (Brown, C. J., concurring specially).

12. Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921, 948 (1965); see also, Friendly, The Federal Administrative Agencies, 58–105 (1962).

issue should be remanded to the Board for further consideration.

We vacate that portion of the Board's order which holds Roberts personally liable for backpay and remand to the Board for further proceedings. If the ruling was inadvertent, the matter will stop there. If the Board is still of the opinion that Roberts is to be held personally liable, the facts which distinguish this case from the Board's prior decisions should be articulated. If this case represents a change in Board policy, the new policy should be explicated. Only then can this court properly consider respondents' contention that the Board has exceeded its statutory authority.

In summary, the petition to enforce is granted except insofar as it imposes liability for backpay on respondent Roberts. The proceeding is remanded to the Board for further consideration of that question in light of this opinion.

Enforced in part, remanded in part.