**SHAW'S SUPERMARKETS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 88–1936.

United States Court of Appeals, First Circuit.

Heard April 4, 1989.

Decided Aug. 31, 1989.

Murray S. Freeman with whom Mark J. Mahoney and Nutter, McClennen & Fish were on brief for petitioner.

Paul Hitterman with whom Rosemary M. Collyer, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Peter Winkler, Supervisory Atty., were on brief for respondent.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

BREYER, Circuit Judge.

The National Labor Relations Board (the "Board") found that Shaw's Supermarkets ("Shaw") violated National Labor Relations Act ("NLRA") § 8(a)(1), 29 U.S.C. § 158(a)(1), during a representation election held at Shaw's Wells, Maine distribution facility in January 1987. In the election, 71 votes were cast for no union, 46 votes for a Teamsters local, and one vote for an independent union. The finding of violation rested primarily upon the fact that five days before the election, a Shaw vice president told the employees at the plant:

> that if they were to turn their affairs over to a third party [i.e., a union] that the employees would be guaranteed minimum wages and workmen's comp[ensa-

---

* Of the District of Massachusetts, sitting by desig- nation.

tion] and that's where our collective-bargaining process would begin.

The Board decided that this statement, taken in context, constituted a "threat of reprisal" against collective organizing, a threat that NLRA §§ 8(a)(1) and 8(c) make illegal. 29 U.S.C. §§ 158(a)(1), 158(c). *See NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). The Board ordered a new election. The Board now asks us to enforce its order.

We have examined the Board's decisions in this case and in prior cases on this subject, however, and comparing those prior cases with the facts of the present case, we conclude that the Board's findings here are inconsistent with what it has held before. That is to say, past precedent would require the Board to find in the employer's favor here. Although the Board is not permanently bound by its precedent, when it wishes to deviate from well-established precedent as significantly as it has done here, it must, at least, explain the reasons for its deviation. Because the Board has not explained its inconsistent decision in this case, we shall not now enforce its order, but instead we shall remand this case to the Board.

## I.

### Background.

A. *Labor law.* The basic principles of labor law that govern this case are well-established. Under NLRA § 7, employees have the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing ..." 29 U.S.C. § 157. Employers may not "interfere with, restrain, or coerce employees in the exercise of" those rights. NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1). Moreover, the NLRA expressly states that a "threat of reprisal or force or promise of benefit" does not constitute otherwise protected "express[ion]." NLRA § 8(c), 29 U.S.C. § 158(c). Thus the NLRA prohibits employer speech during an election campaign which contains a "threat of reprisal" and thereby "interfere[s] with, restrain[s] or

coerce[s]" employees in the exercise of their rights to "form, join or assist" labor unions. *See NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).

 Whether any particular employer speech amounts to such a "threat of reprisal" depends upon the *context* in which the speech is uttered. *Wyman–Gordon Co. v. NLRB*, 654 F.2d 134, 145 (1st Cir.1981); *Belcher Towing Co.*, 265 NLRB 1258, 1268 (1982); *Plastronics, Inc.*, 233 NLRB 155, 156 (1977); *Wagner Industrial Products Co.*, 170 NLRB 1413, 1413 (1968). And, as a general rule, the law gives the Board, not the courts, the authority to examine the circumstances, to find the facts, and to decide whether the remarks, in context, amounted to an unlawful threat. *See NLRB v. Marine Optical, Inc.*, 671 F.2d 11, 18 (1st Cir.1982) ("Generally, courts will defer to the Board's special expertise on the impact of employer statements to employees."). *See also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 5 U.S.C. § 706(2)(E) (agency's fact findings must be supported by "substantial evidence"). But, as we shall discuss shortly, the Board's findings must be consistent with its own rules and precedents or the Board must explain the deviation. *See infra* pp. 36–37.

B. *Facts.* In January 1987, in the midst of a union representation campaign, and five days before the election, Charles Wyatt, Shaw's vice president for distribution, held three meetings with three different groups of employees. In response to questions at the first meeting, Wyatt said that if a union won "the employees would be guaranteed minimum wages and workmen's comp and that's where our collective bargaining process would begin." He made the same statement to the other two groups of employees. Wyatt also told all the employees that "typically the art of collective bargaining is a give and take process and that ... we would start with minimum wages and workmen's comp and build from that point." Wyatt referred to a union as a "third party." He also said that "the first contract is generally the

toughest or hardest to negotiate ... and that generally it could take up to a year." Wyatt's audience contained both full-time employees, then earning up to $11.70 an hour, and part-time employees, then earning about $5.00 an hour; the federal minimum wage at that time was $3.55 an hour.

The Board found no other unfair labor practices committed by Shaw during this election campaign. We can find nothing else in the record that might sharpen the details or color the background of the "context" of the bargaining campaign, either in the Board's or the company's favor. And as Board counsel told us at oral argument, neither can the Board.

## II.

### *The Problem of Inconsistency.*

Were the Board writing on a blank slate, were there no set of Board cases on the subject, we should likely find sufficient basis in the record to sustain the Board's conclusion. Statements like those at issue here—that the company will "begin" its bargaining at "minimum wages and workmen's comp," that it will "build from that point"—might, depending on the context, innocently represent a legal truth about how the collective bargaining process works, legitimately remind employees that a union might trade certain payments or benefits that many workers now enjoy in order to obtain other payments or benefits, or improperly constitute a threat that, if the union wins, the employer will strip benefits back to the minimum, forcing the union to struggle even to keep the status quo. In deciding how to react to these statements, a court must recognize that the Board is expert, not simply about the factual context of the individual case, but also about how employees are likely to understand certain forms of words in the mine-run of cases. Thus, if the Board were to conclude that it should always assume that employees would reasonably take words of the sort at issue here as threats of regressive bargaining in the absence of added employer explanation to the contrary, we believe (though we need not, and do not decide) that a court could not easily say the

Board was acting outside the authority that the law grants it.

The problem in this case for the Board, however, is that (a) it is not writing on a blank slate, but has written on the subject often in the past; (b) the Board has not said that it wishes to depart from its several prior cases on the subject; yet (c) as we shall discuss below, the prior cases dictate a result in Shaw's favor.

■ The law that governs an agency's significant departure from its own prior precedent is clear. The agency cannot do so without explicitly recognizing that it is doing so and explaining why. As Professor Davis has pointed out, "[t]he dominant law clearly is that an agency must either follow its own precedents or explain why it departs from them." 2 K. Davis, Administrative Law Treatise § 8:9 at 198 (1979). The agency has a

> duty to explain its departure from prior norms. *Secretary of Agriculture v. United States,* [347 U.S. 645, 653–54, 74 S.Ct. 826, 831–32, 98 L.Ed. 1015 (1954)]. The agency may flatly repudiate those norms, deciding, for example, that changed circumstances mean that they are no longer required in order to effectuate congressional policy. Or it may narrow the zone in which some rule will be applied, because it appears that a more discriminating invocation of the rule will best serve congressional policy. Or it may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case. *Whatever the ground for departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate....*
>
> [If] the agency distinguishes earlier cases[, it must] assert[ ] distinctions that, when fairly and sympathetically read in the context of the entire opinion of the agency, reveal the policies it is pursuing.

*Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade,* 412 U.S. 800, 808–09, 93 S.Ct. 2367, 2375–76, 37 L.Ed.2d 350 (1973) (plurality opinion) (emphasis added).

It is, of course, true that the Board is free to adopt new rules of decision and that the new rules of law can be given retroactive application. Nevertheless the Board may not depart sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case. As this court held in *Mary Carter Paint Co. v. FTC* [333 F.2d 654, 660 (5th Cir.1964) (Brown, J., concurring), *rev'd on other grounds,* 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128 (1965) ], "there may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case." "[A]n inadequately explained departure solely for purposes of a particular case, or the creation of conflicting lines of precedent governing the identical situation, is not to be tolerated."

*NLRB v. International Union of Operating Engineers, Local 925,* 460 F.2d 589, 604 (5th Cir.1972) (citations omitted). *See also Massachusetts Dep't of Education v. United States Dep't of Education,* 837 F.2d 536, 544–45 (1st Cir.1988) (once an agency "builds a body of precedent ... it cannot thereafter lightly disregard" that precedent, but must follow, distinguish, or overrule it); *National Black Media Coalition v. FCC,* 775 F.2d 342, 355 (D.C.Cir. 1985) ("it is also a clear tenet of administrative law that if the agency wishes to depart from its consistent precedent it must provide a principled explanation for its change of direction."); *Baltimore Gas & Electric Co. v. Heintz,* 760 F.2d 1408, 1418 (4th Cir.) ("It is a well-settled proposition of administrative law that when an agency deviates from established precedent, it must provide a reasoned explanation for its failure to follow its own precedents ... when an agency treats two similar transactions differently, an explanation for the agency's actions must be forthcoming.") (citations omitted), *cert. denied,* 474 U.S. 847, 106 S.Ct. 141, 88 L.Ed.2d 116 (1985); *Local 777, Democratic Union Organizing Commit-*tee *v. NLRB,* 603 F.2d 862, 871–72 (D.C.Cir. 1978) (when the NLRB "fails to distinguish contradictory decisions rendered in similar cases," it forfeits "the deference we would otherwise show to its very considerable expertise in strictly labor matters."); *Greyhound Corp. v. ICC,* 551 F.2d 414, 416 (D.C.Cir.1977) (per curiam) ("This court emphatically requires that administrative agencies adhere to their own precedents or explain any deviations from them.").

## III.

### *The Board's Departure from Precedent.*

■ The Board says that Wyatt's statements fell within a category it calls "bargaining from scratch." It has held the making of such statements unlawful when, in context, a reasonable employee would take them as a coercive threat that an employer will engage in "regressive bargaining," by removing wages and benefits if the union wins. The Board has distinguished lawful from unlawful "bargaining from scratch" statements by ascribing importance to the varying elements of the factual contexts embodied in its past precedent. *See NLRB v. Cable Vision, Inc.,* 660 F.2d 1, 5–6 (1st Cir.1981); *Wyman–Gordon,* 654 F.2d at 145; *Beverly Enterprises-Indiana, Inc.,* 281 NLRB 26, 30 (1986); *Histacount Corp.,* 278 NLRB 681, 689 (1986); *Plastronics, Inc.,* 233 NLRB at 156; *Wagner Industrial Products,* 170 NLRB at 1413.

The relevant "bargaining from scratch" precedents are of two sorts. First, in several cases the Board has found that a "bargaining from scratch" statement did *not* violate § 8(a)(1), because it did not amount to regressive bargaining. In reverse chronological order, these cases include:

(1) *La–Z–Boy,* 281 NLRB 338 (1986). The employer, in response to union statements that wages and benefits would increase with a union victory, told workers that "everything else is up for negotiations [and the] minimum wage would be the bottom line." But he added that it would be "ridiculous" to think the employer would drop wages to the minimum. *Id.* at 339.

The Board found these statements, taken together, to be "nothing more" than an explanation of "the realities of negotiations [and] the give-and-take of bargaining." *Id.* at 340.

(2) *Histacount Corp.*, 278 NLRB 681 (1986). The employer said:

There is no guarantee that the company's existing benefits 'before bargaining' will survive the bargaining. In short, the company is legally entitled to bargain from 'ground zero.' This means that a company can get rid of one or more of its pre-existing benefits in the course of bargaining.

*Id.* at 686. He also said that "every pre-benefit is 'up for grabs,' " and that bargaining could take "years" before a contract was reached, *id.* He added that "the company would bargain 'in good faith.' " *Id.* The Board found that these comments, in context, did not indicate that the employer would "unilaterally discontinue existing benefits if the employees selected union representation, but rather that existing benefits may be lost as a result of bargaining." *Id.* at 689.

(3) *Clark Equipment Co.*, 278 NLRB 498 (1986). The employer said that "bargaining means putting everything on the table, including the benefits you already have ... Bargaining with a union can be a complicated and time-consuming process ... bargaining starts from scratch ... we would bargain in good faith." *Id.* at 499. The Board found no violations because the employer had not threatened not to bargain in good faith, nor that *only* regressive proposals will result." *Id.* at 500 (emphasis in original).

(4) *Campbell Soup Co.*, 225 NLRB 222 (1976). The employer said that "bargaining begins from *scratch.* Under the law, an employer is not required to agree to continue in effect existing benefits. Bargaining for a contract *does not* start from a base of existing benefits or from the benefits that employees already have.... If the union wins the election everything is up for grabs." *Id.* at 225 (emphasis in original). The employer also referred to the union as a "third party." *Id.* The

Board found no violation because there was no evidence the employer would itself reduce benefits upon a union victory, but only that through bargaining the union might decide to trade existing benefits for other benefits. *Id.* at 229.

(5) *Ludwig Motor Corp.*, 222 NLRB 635 (1976). The employer said "the truth is that you can lose wages and benefits in collective bargaining! ... all your present and/or future benefits are negotiable ... the negotiation is going to start with a blank piece of paper and each present wage or each present benefit will be negotiated.... Ludwig Motors obviously would bargain in good faith, and would bargain within the frame of the law." *Id.* at 635. The employer also affirmed its intention, "in order ... to keep the competent people it takes to run our business ... to pay the going rate in wages and in benefits.... And that is true union or no union." *Id.* at 635–36 n. 6. The Board found no violation because the remarks were an "accurate description of one possible consequence of lawful collective bargaining," because the employer appeared to be "answer[ing] the Union's claims" as to increased benefits, and because of the employer's "frequent assertions that it would bargain in good faith." *Id.* at 635.

(6) *White Stag Manufacturing Co.*, 219 NLRB 1246 (1975). The employer said "people think who have not been exposed to this kind of situation that bargaining starts at where you are today. This is not true. It starts at what you call the federal minimum ..." *Id.* at 1250. The employer said that bargaining starts at a "bare table," *id.* at 1248, and that benefits "can be taken away if the Union gets in, if the Union agrees in the negotiations that that is what we settle for, because it is negotiable. You negotiate from the bare minimum. We have no intentions of taking away, history proves that we never have." *Id.* at 1249. The Board found no violation because the employer's statements did not show that it would "refuse to bargain in good faith, but is rather an expression of the Employer's views about the nature of collective bargaining." *Id.* at 1250.

(7) *Computer Peripherals, Inc.*, 215 NLRB 293 (1974). The employer said "bargaining starts from scratch. We do not know at this time what the eventual outcome of any bargaining sessions might be.... if you think I am going to start bargaining from where you are now you've got another think coming. I'm going to start from scratch, a minimum proposal. If the Union wants something like checkoff of union dues or preferred security for stewards they may have to exchange vacations, paid sick time or some other superior benefit you now have in order to get these things. Bargaining is just that, give and take." *Id.* at 293–94. The Board found no violation on the grounds that the employer had not threatened "that all existing benefits would unilaterally be eliminated if the union were successful," *id.* at 294, and that "the main thrust" of the employer speech was to say a union victory would not "automatically secure to employees a large increase in wages and benefits," *id.* Hence there was "no implication that any benefits would be taken away unilaterally ... rather the emphasis was on the possible results of lawful bargaining ... benefits depended on the give and take of bargaining." *Id.*

(8) *Wagner Industrial Products Co.*, 170 NLRB 1413 (1968). The employer said that "Under the law, an employer is not required even to continue in effect existing benefits if a union wins. Bargaining starts from scratch. What wages and conditions will prevail thereafter depends on what the employer is willing to give." The Board found no violation because there were no accompanying unfair labor practices, and because "the main thrust" of the employer speech was that a union victory would not "automatically" raise wages and benefits. *Id.* There was "no specific implication that [the employer] intended to adopt a bargaining posture offering the employees less than they were then receiving." *Id.*

In many of these cases, particularly *Histacount, Clark Equipment, Campbell Soup,* and *Computer Peripherals,* the statements in context seem to us just as threatening (if not more so) than those in the present case. We do not see how, after reading the record in this case and the opinions in the cases we have just mentioned, one could reasonably find no violation in those earlier cases yet find a violation in this case. Wyatt used language virtually identical to that used in the cases just listed.

The Board, in its brief, attempts to distinguish these precedents by arguing that this case involved a statement by a high company official, who said that the first contract would be the "toughest to negotiate" and could "take up to a year," and who did not explicitly state that the company would not engage in regressive bargaining. But several of the cases finding no violation involved high-ranking officials, *see, e.g., La–Z–Boy* (personnel manager); *Campbell Soup Co.* (plant manager); *Ludwig Motor Corp.* (president of company); *White Stag* (vice president of manufacturing); one of these cases involved an employer who said bargaining would take "years," *see Histacount Corp.*, 278 NLRB at 686, 689; *see also Clark Equipment Co.*, 278 NLRB at 499 (no violation where employer said "[b]argaining with a union can be a complicated and time-consuming process"); and several other of these cases involved no explicit offsetting promise to bargain in good faith, *see, e.g., Campbell Soup; Computer Peripherals; Wagner.* The Board decision here (though not its brief) also said that employers were attempting in past cases to respond to employees' potential belief that the union would necessarily raise benefits, but the record here shows that Shaw's employees asked questions reflecting the same idea; and it said that Wyatt's reference to the union as a "third party" was inaccurate and pejorative, but prior case law does not support reliance on that factor. *See Campbell Soup*, 225 NLRB at 225 (use of term "third party" for union not found to violate 8(a)(1)).

The record does not reveal any other elements suggesting regressive bargaining. Indeed, Board counsel at oral argument simply stated that he "did not know" just what it was in the context of the prior cases finding no violation that "made these same statements" benign there, yet harmful here. Counsel's statement, in our view,

honestly reflects the circumstances, for we do not see how one can distinguish prior cases in which the Board found "no violation."

Of course, there are other cases in which the Board found that a "bargaining from scratch" statement violated the law. But these cases are more distant from the present case. They include:

(1) *Beverly Enterprises–Indiana, Inc.*, 281 NLRB 26 (1986). The employer said that bargaining "starts out fresh ... you don't start out with what's in the handbook [of benefits]," *id.* at 29. The personnel director held up the handbook and waved it while making these comments. The Board found that this conduct constituted a violation of § 8(a)(1) because, although the words themselves "might well be a permissible statement," the employer's act of "holding up and waving the employee handbook in context with the above remarks," and the fact that this statement "was made *following the discriminatory transfer of the principal union activist* ... must be deemed an implied threat." *Id.* at 30 (emphasis added).

(2) *Mississippi Chemical Corp.*, 280 NLRB 413 (1986). The employer told employees "that he could not possibly see where a union would benefit the employees ... all 'they' would do was to *knock employees down* to a minimum wage, *take all* their benefits, and *then* they would have to bargain from scratch." *Id.* at 417 (emphasis added). The Board found this to violate § 8(a)(1) because it was an "express threat" that bargaining "would start only *after* employees had been reduced to 'minimum wage' and all their benefits taken away." *Id.* (emphasis added). The Board also found *several other unfair labor practices* had occurred.

(3) *Belcher Towing Co.*, 265 NLRB 1258 (1982). The employer said bargaining would start from "ground zero" and that the employer would take "a hard stance," *id.* at 1260. The Board found a violation because it thought the "ground zero" comment, "in the context of *[several]* other unfair labor practices," *id.*, meant that the employer would reduce benefits *before*

the start of bargaining, if the union won. *Id.* at 1268.

(4) *Plastronics, Inc.*, 233 NLRB 155 (1977). The employer gave a presentation to the employees. He said bargaining would be "from scratch," and he exhibited several transparency charts to the employees stating "in bold letters" that the "Beginning Point" of bargaining would "1. wages—federal minimum $2.30 per hour; 2. No paid holidays; 3. No paid vacations; 4. No medical insurance; 5. No life insurance; 6. No pension plan; 7. No savings plan." *Id.* at 155. The Board found that his comments "established unequivocally" that existing wages and benefits "would be lost" *before bargaining began*, simply upon the union's victory. *Id.* at 156.

In almost all these cases, the "bargaining from scratch" speech was accompanied by other serious unfair labor practices, such as the discriminatory treatment of labor organizers. *See Beverly Enterprises–Indiana, Inc.*, 281 NLRB at 29 (statement "was made following the discriminatory transfer of the principal union activist"); *Mississippi Chemical Corp.*, 280 NLRB 413 (several other unfair labor practices); *Belcher Towing Co.*, 265 NLRB 1258 (same). Here there were no other unfair labor practices committed. And in the cases finding violations, the language and context suggested, far more strongly than here, a threat to eliminate benefits before bargaining. *Compare Mississippi Chemical Corp.*, 280 NLRB at 417 (statement that the result of a union victory would be to "knock down" all wages and to "take all their benefits" was an "express threat" that bargaining "would start only after employees had been reduced to 'minimum wage' and all their benefits taken away."); *Belcher Towing Co.*, 265 NLRB at 1268 ("ground zero" comment, in the context of several other unfair labor practices, meant that employer would reduce benefits if the union won); *and Plastronics, Inc.*, 233 NLRB at 156 (violation when comments "established unequivocally" that existing wages and benefits "would be lost" before bargaining began), *with Histacount Corp.*, 278 NLRB at 689 (these com-

ments, in context, did not indicate that the employer would "unilaterally discontinue existing benefits if the employees selected union representation, but rather that existing benefits may be lost as a result of bargaining."); *Campbell Soup Co.*, 225 NLRB at 229 (no violation because there was no evidence the employer would itself reduce benefits upon a union victory, but only that through bargaining the union might decide to trade existing benefits for other benefits); *Computer Peripherals, Inc.*, 215 NLRB at 294 (no violation on the grounds that the employer had not threatened "that all existing benefits would unilaterally be eliminated if the union were successful" and "no implication that any benefits would be taken away unilaterally ... rather the emphasis was on the possible results of lawful bargaining ... benefits depended on the give and take of bargaining."). Here Wyatt's language in context does not suggest "unilateral" reductions, so much as it suggests "give and take" of the sort that the Board, in earlier cases, has approved. *See, e.g., La–Z–Boy*, 281 NLRB at 340; *Plastronics*, 233 NLRB at 156; *Computer Peripherals*, 215 NLRB at 294.

In sum, the cases draw a boundary between the lawful and unlawful. And, given that boundary, this case is not borderline, but, rather, lies tucked well within the boundary of the lawful.

In finding the Board's decision in this case inconsistent with its precedents, we do not intend to impose upon the Board the time consuming obligation of microscopically examining prior cases; nor to encourage counsel to examine past precedent with an eye towards raising hosts of legalistic arguments and distinctions. Here, however, the past cases trace a relatively clear line. Nor do we believe that past cases are a straitjacket, inhibiting experimentation or change. But, as we have explained, *supra* pp. 36–37, the Board remains free to modify or change its rule; to depart from, or to keep within, prior precedent, as long as it focuses upon the issue and explains why change is reasonable. *See Atchison*, 412 U.S. at 808, 93 S.Ct. at 2375; *Baltimore*

*Gas & Electric Co.*, 760 F.2d at 1418; *Operating Engineers*, 460 F.2d at 604. Unless an agency either follows or consciously changes the rules developed in its precedent, those subject to the agency's authority cannot use its precedent as a guide for their conduct; nor will that precedent check arbitrary agency action. *See Atchison*, 412 U.S. at 808–09, 93 S.Ct. at 2375–76; *Local 777*, 603 F.2d at 872; *Contractors Transport Corp. v. United States*, 537 F.2d 1160, 1162 (4th Cir.1976).

For these reasons we decline to enforce the Board's order, and we *remand* the case to the Board. *See Atchison*, 412 U.S. at 822, 93 S.Ct. at 2382–83 (remand is appropriate remedy); *Secretary of Agriculture*, 347 U.S. at 655, 74 S.Ct. at 832–33 (same); *Operating Engineers*, 460 F.2d at 604–05 (same).