**CITY OF AUSTIN, TEXAS, BRACKEN-RIDGE HOSPITAL, Plaintiff-Appellant,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant-Appellee.**

No. 84–1003.

United States Court of Appeals, Fifth Circuit.

Feb. 25, 1985.

Roger L. Levy, Washington, D.C., for plaintiff-appellant.

Edward C. Prado, U.S. Atty., San Antonio, Tex., Mary K. Biester, Charlene M. Seifert, Attys., Dallas, Tex., for defendant-appellee.

Before BROWN, WILLIAMS and GARWOOD, Circuit Judges.

PER CURIAM:

This appeal contests the validity and application of prospective limitations that appellee, the Secretary of Health and Human Services, placed on the reimbursement that providers of Medicare services may recover for costs they incur in supplying routine inpatient care to beneficiaries of the Medicare program. Three administrative tribunals as well as the district court rejected Brackenridge Hospital's demand for reclassification to a higher category in the reim-

bursement scheme and its claim for exceptions to the limitations. The district court, 574 F.Supp. 582, also disallowed appellant's challenge to the validity of the limitations. Because we find the limitations valid in general and their application to appellant City of Austin, Texas/Brackenridge Hospital proper in particular, we affirm the district court's summary judgment in favor of the Secretary.

## I.

### A. *The Statutory Scheme*

The Medicare program, which Congress brought to life by enacting Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395xx (1982) (as amended), subsidizes the medical expenses of elderly and disabled citizens. Part A of Title XVIII, 42 U.S.C. §§ 1395c–1395i–2 (1982), governs the reimbursement program that gave rise to Brackenridge's claims. The program functions not through disbursements to beneficiaries but through payments to "providers"—hospitals, nursing homes, hospices, and similar institutions—that provide health care to persons covered by Medicare. *Id.* § 1395g (1976).[1] A provider wishing to participate in the program must enter into an agreement with the Secretary. This contract details the respective obligations of the provider and the Secretary under the program. *Id.* § 1395cc (1976). Essentially an insurance program, this portion of the Medicare system subsidizes inpatient and some outpatient services, but it does not cover all kinds of health care, and it limits the duration of benefits. *Id.* § 1395d (1976).

Money, of course, propels the program, and the statute sets out a number of provisions governing the amounts that providers may recover as reimbursement. One such provision entitles each participating provider to the lesser amount of "the reasonable cost of such services" it supplies to Medicare beneficiaries or "the customary charges with respect to such services." *Id.* § 1395f(b)(1) (1976). A customary charge, as the term itself implies, reflects the fee for which the provider normally bills non-Medicare patients upon providing the particular service to them. Reasonable cost, however, defies ready determination since it depends on factors peculiar to each provider and the area in which it operates.

Because a provider's customary charges usually exceed its reasonable cost of supplying a service, the amount of the latter generally constitutes the reimbursement that the provider may recover. Congress, however, shied away from a restrictive definition of reasonable cost, instead empowering the Secretary to issue regulations establishing the governing criteria. *See id.* § 1395x(v)(1) (1976).[2] Title XVIII also authorizes the Secretary to promulgate regulations prospectively limiting the amounts that providers may recover as reasonable cost:

> Such regulations may provide ... for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance pro-

1. We shall refer throughout the opinion to the statutory and regulatory provisions in force at the time relevant to Brackenridge's claims.

2. Section 1395x(v)(1) provides that "[t]he reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A) (1976). It further states that the Secretary "shall" determine reasonable cost "in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining

such costs for various types or classes of institutions, agencies, and services...." *Id.* Other provisions of the Social Security Act confer on the Secretary broad authority to promulgate regulations in the exercise of her responsibility to administer the Act. *See id.* § 1395hh (empowering Secretary to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter"); *id.* § 1395ii (incorporating 42 U.S.C. § 405 (1976), which authorizes Secretary to make regulations and rules she deems necessary to implement the purposes of the Act).

grams established under this subchapter....

*Id.* § 1395x(v)(1)(A) (1976).[3] The primary source for determining reasonable cost thus lies in the regulations.

If money drives the program, paperwork provides the tinder. In fulfilling its obligation to establish its entitlement to reimbursement, a provider may choose to deal directly with the Secretary, or it may elect to file its documentation with a public or private "fiscal intermediary". *See id.* § 1395h(a) (1976). In the latter circumstance, the intermediary must contract with the Secretary to discharge certain functions as the Secretary's surrogate. *Id.; see id.* § 1395h(c) (1976) (authorizing agreements with intermediaries containing "such terms and conditions as the Secretary finds necessary or appropriate"). The intermediary must, among other things, "make such audits of the records of providers as may be necessary to insure that proper payments are made under this part...." *Id.* § 1395h(a)(2)(B) (1976).

### B. *Toward a Definition of Reasonable Costs: The Regulatory Framework*

Because the Secretary's promulgation and employment of prospective limitations figure centrally in this case, we discuss the relevant regulations in some detail. The Secretary accepted the congressional invitation to limit prospectively the amounts for which providers could claim reimbursement by issuing new 20 C.F.R. § 405.460 (1976). *See* 39 Fed.Reg. 20,164 (1974) (promulgating "Limitations on Coverage of Costs under Medicare"). In relevant part, the regulation provided as follows:

(b) *Application.* In determining the limits to be applied, providers may be classified by type of provider (e.g., hospitals, skilled nursing facilities, home health agencies) and within each provider class by such factors as the Secretary shall find appropriate and practical, such as:

(1) Type of services rendered;

(2) Geographical area where services are rendered, allowing for grouping of noncontiguous areas having similar demographic and economic characteristics;

(3) Size of institution;

(4) Nature and mix of services rendered; or

(5) Type and mix of patients treated. 20 C.F.R. § 405.460(b) (1976); 39 Fed.Reg. at 20,165 (1974). The regulation also required publication of notice in the *Federal Register* prior to the commencement of a cost period to which the limitations would apply. 20 C.F.R. § 405.460(d) (1976). Subsection (f) entitled providers to seek reclassification within the limitations scheme, exceptions for their provision of "atypical services", and exceptions due to "extraordinary circumstances". *Id.* § 405.460(f) (1976).[4]

---

**3.** Congress added the provision authorizing prospective limitations on reasonable cost in 1972. *See* Social Security Amendments of 1972, Pub.L. 92–603, § 223(b), 86 Stat. 1329, 1393, *reprinted in* 1972 U.S.Code Cong. & Ad. News 1548, 1628. For discussion of the significance of the change, see *infra.*

**4.** This portion of the regulation provided relief from the cost limitations in the following terms:

(f) *Exceptions, exemptions, and adjustments.* The following types of exceptions, exemptions, and classification adjustments may be granted under this section but only upon the provider's demonstration that the conditions indicated are present:

(1) *Reclassification.* A provider shall be entitled to obtain adjustment of its classification by the intermediary for the purpose of cost limits applied under this section on the basis of evidence that such a classification is at variance with the criteria specified in promulgating limits under paragraph (d) of this section.

(2) *Exception of cost of atypical services.* Where the actual cost of items or services furnished by a provider exceeds the applicable limit by reason of the provision of items or services that are atypical in nature and scope as compared to the services generally provided by institutions similarly classified and appropriate reason exists for the provision of such items or services, the limits may be adjusted upward to reflect any added costs flowing from the delivery of such items or services. Such adjustments may only be made where the provider demonstrates: (i) The provision of the atypical items or services were by reason of the special needs of the patients treated and necessary in the efficient delivery of needed health care, or (ii) the added costs flow from approved education

The regulation implemented the congressional authorization of prospective limitations in the 1972 amendments, *see supra* note 3, and the principles it enunciated applied to all limitations that the Secretary determined to establish on reasonable cost of providers. *See id.* § 405.460(a) (1976) (stating general principle governing "the determination of the allowability of provider costs").

On May 30, 1975, the Secretary promulgated the regulation that governed a portion of Brackenridge's reimbursable costs during the period for which it claims entitlement to additional reimbursement. 40 Fed.Reg. 23,622 (1975).[5] The limitations applied only to "Hospital Inpatient General Routine Service Costs," *id.*, and unless a hospital qualified for a reclassification or exception to the limitations, it could receive no more than the amount the regulation permitted for its per day costs of supplying general routine inpatient hospital services for each patient.

The regulation established prospective limitations by classifying hospitals in a series of subgroups. The initial division separated hospitals in Standard Metropolitan Statistical Areas (SMSA's) from those in outlying areas (non-SMSA's). The distinction reflected essentially an urban/rural dichotomy. The next grouping divided all SMSA's and non-SMSA's into five groups that reflected a hierarchy of per capita income. The SMSA's and non-SMSA's with the highest per capita income, in other words, received a "Group I" classification, while those with the lowest per capita income fell within the "Group V" classification. The final division classified according to a characteristic of each hospital—the number of beds it maintained. At this level of specificity, the regulation correlated dollar amounts with each "bed size" of hospitals in the five groups.[6]

As it must do for other expenses it incurs under the Medicare program, a provider claiming reimbursement for general routine hospital inpatient costs must document its entitlement. To do so, the provider must submit an annual cost report after the end of its fiscal year, 20 C.F.R. § 405.-406 (1976), either to the Secretary or the fiscal intermediary it has chosen. The report contains financial and other data on the provider's operations, and it embodies the costs for which the provider seeks reimbursement. The Secretary or fiscal intermediary then determines the "allowable" costs of the provider according to the principles in 20 C.F.R. § 405.452 (1976). The Secretary or intermediary next calculates reimbursable costs by determining the amount of allowable costs attributable to participation in the Medicare program.

activities (as described in § 405.421) to the extent such costs are atypical (although reasonable) for providers in the comparison group. In addition, such adjustments may be made only to the extent that such justified costs are separately identified by the provider and can be verified by the intermediary.

   (3) *Exception because of extraordinary circumstances.* Where a provider's costs exceed the limits due to extraordinary circumstances beyond the control of the provider, the provider may request an exception from the cost limits to the extent that the provider shows such higher costs result from the extraordinary circumstances. These circumstances may include but are not limited to increased costs attributable to strikes, fire, earthquake, flood, or similar unusual occurrences with substantial cost effects.
20 C.F.R. §§ 405.460(f)(1), (2) & (3) (1976). Sections 405.460(f)(4) and 405.460(g) provided for other exceptions not relevant in this case.

The current version of the regulation appears in 42 C.F.R. § 405.460 (1983).

5.  The new provisions amended an interim regulation that the Secretary had promulgated the year before. *See* 39 Fed.Reg. 20,168 (1974).

6.  The following table reflects the per patient, per day amounts the regulation allowed for the five SMSA groups:

| SMSA group | Fewer than 100 | 100 to 404 | 405 to 684 | 685 and above |
|---|---|---|---|---|
| I . . . . . . . . . | $113 | $111 | $133 | $174 |
| II . . . . . . . . . | 91 | 96 | 96 | 120 |
| III . . . . . . . . . | 89 | 88 | 89 | 89 |
| IV . . . . . . . . . | 86 | 86 | 87 | 87 |
| V . . . . . . . . . | 65 | 72 | 84 | 84 |

*See* 40 Fed.Reg. 23,625 (1975) (setting forth table). The regulation set different rates for non-SMSA's and for Anchorage, Alaska, and Honolulu, Hawaii. *See id.*

The provider may request exceptions from the cost limitations or reclassification within the limitations scheme. *See* 20 C.F.R. § 405.460(e) (1976) (providing for intermediary review of its determination regarding reclassification or exceptions).

## II.

We briefly state the facts, which are not in dispute. Brackenridge Hospital is a nonproprietary institution that the City of Austin owns and operates. It provided at all relevant times a typically broad range of health services to residents of Austin and the surrounding area. It represented the only major acute trauma and teaching facility in a ten-county area, and it offered such special services as open heart surgery, computerized axial tomography, and renal dialysis. No other area hospital maintained an outpatient department; the one that Brackenridge operated treated some 33,000 patients annually in twenty-four specialty clinics. The hospital also supplemented its primary care facilities with several diagnostic support departments.

The circumstances underlying Brackenridge's claim in this case arose in 1976, when the hospital incurred Medicare general inpatient routine service costs some $530,000 in excess of the amount the Secretary's cost limitations allowed for reimbursement. At the time, the Secretary had classified the Austin SMSA in Group V for cost limitations purposes. *See* 40 Fed.Reg. 23,624 (1975). That designation reflected the relatively low per capita income of Austin SMSA residents, but of all SMSA's in Group V the Austin SMSA stood at the top in terms of income.

Events at the hospital raised its costs of operations. The murder of a nurse in the Brackenridge emergency room in January 1976, prompted the hospital to upgrade its security measures, resulting in an increase in expenditures. Another cost-increasing circumstance arose from the hospital's status as property of the City of Austin, which required Brackenridge to pay wages in excess of those prevailing in other area hospitals. Below cost provision of health care to low-income residents of Austin and Travis County further raised expenses, as did the hospital's pioneering efforts to develop data processing programs and facilities.[7]

Brackenridge requested its fiscal intermediary to recommend granting the hospital a reclassification into Group IV of the cost limitations hierarchy and exceptions for the unusual costs it had incurred. The hospital based its reclassification request on the ground that the statistics the Secretary had used in determining per capita income in the Austin SMSA understated income due to the residence of many college and university students, who comprised fourteen percent of the population in the area. The Secretary's calculations should accordingly have revised the per capita income figures upward to reflect the fact that students' purchasing power, and hence their influence on prices in the Austin SMSA, exceeds their income. Brackenridge also asked for exceptions in recognition of its expenditures for maintenance of greater security, higher wages for nurses, costs of developing an innovative data processing system, and expenses for providing social services to Austin and Travis County indigents. The intermediary declined each request.

Brackenridge's efforts to obtain relief from the cost limitations in administrative proceedings proved no more successful. The Health Care Financing Administration (HCFA), the Provider Reimbursement Review Board (PRRB), and the HCFA Administrator each rejected the hospital's claims. The Administrator's decision constituted final agency action, leaving to the hospital further review only in court. *See* 42 U.S.C. § 1395oo (f) (1982).

Brackenridge filed this case on April 5, 1982. The complaint requested a declaratory judgment that the cost limitations lacked validity in that they conflicted with the

---

7. Brackenridge claimed exceptions for other costs, but the hospital obtained satisfaction of those claims before the onset of litigation in the district court. Accordingly, there is no need to address them.

Medicare statute and the Secretary's own regulations. Brackenridge also claimed that the Secretary violated her own regulations in refusing to reclassify the Austin SMSA and in declining to grant the exceptions Brackenridge requested. The hospital also sought a remand to the Secretary for determination of the amount of additional reimbursement it should have received and an award of interest and costs.

The district court decided cross motions for summary judgment in favor of the Secretary. In upholding the validity of the cost limitations, the court accorded a high level of deference to the Secretary's interpretation of the Medicare legislation. The court also found that Brackenridge had failed to demonstrate its entitlement to exceptions it claimed on account of extraordinary circumstances and provision of atypical services. Brackenridge timely appealed from that judgment.

### III.

The parties agree on the facts. Their dispute centers on the standard of review this court should apply in determining the lawfulness of the Secretary's actions. The Secretary argues that the district court properly gave great deference to her interpretation of the statute and regulations. Brackenridge, on the other hand, protests that the Secretary's inconsistency of interpretation warrants a more searching review. The question of the weight courts should give to an agency's interpretation of its governing statute recurs frequently in cases involving review of agency action. We accordingly inquire into the relevant law to determine whether the district court correctly applied it in this case.

The Administrative Procedure Act, 5 U.S.C. § 706 (1982), prescribes in general the scope of judicial review of the Secretary's actions in administering the Medicare statute. 42 U.S.C. § 1395oo (f) (1982). Whether the case requires review of an agency adjudication or its promulgation of a rule, "[t]he district court, and this court, ... may overturn the Secretary's decision only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Sun Towers, Inc. v. Schweiker (Sun Towers I)*, 694 F.2d 1036, 1038 (5th Cir.1983) (citing 5 U.S.C. § 706). Moreover, because Congress charged the Secretary with the primary responsibility for interpreting the cost reimbursement provisions of the statute, the courts accord particular deference to her interpretation of the Medicare legislation. *E.g., Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977); *Sun Towers, Inc. v. Heckler (Sun Towers II)*, 725 F.2d 315, 325–26 (5th Cir. 1984) ("The validity of the Secretary's regulations 'will be sustained so long as [they are] "reasonably related to the purposes of the enabling legislation" ....' "). The courts afford even greater deference where the challenge relates to the Secretary's interpretation of her own regulations. *See, e.g., Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–34, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897, 910 (5th Cir.1983) (deferring to Corps of Engineers' interpretation of regulations under Clean Water Act).

In attacking the prospective cost limitations, Brackenridge urges that the Secretary's interpretations of the statute and of her regulations do not warrant a high level of deference because she and her predecessors have rendered different interpretations over the years since 1972. Without inquiring into the particulars of the hospital's argument, we note that the principle on which it relies has limited application in cases contesting the legality of regulations that possess legislative force. The doctrine of varying deference on account of inconsistency of interpretation applies primarily where Congress has not expressly delegated to the agency the task of developing rules that have the effect of law. Thus, the *Batterton* Court distinguished "interpretative" regulations from those "with legislative effect":

By way of contrast, a court is not required to give effect to an interpretative regulation. Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise. See *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–145, 97 S.Ct. 401, 410–412, 50 L.Ed.2d 343 (1976); *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 1072–1075, 39 L.Ed.2d 270 (1974); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). *Batterton*, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9; *see Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) (deferring to Treasury Department's consistent interpretation in adjudications of Tariff Act of 1930).

Where, on the other hand, the agency issues a regulation with legislative effect pursuant to an express congressional grant of authority, consistency of interpretation bears but little on the question that courts must resolve: whether the regulation comports with the statute. In such cases, Congress has delegated some of its law-making power to the agency. Under section 706 of the Administrative Procedure Act, then, whether the agency acted "in accordance with law" involves inquiry into whether the action falls within the boundaries of the grant of power in the enabling act. By hypothesis, the agency may exercise its authority by adopting a means of implementing the legislative policy and later amending it. So long as its interpretations do not exceed the statutory bounds and do not trench excessively upon the expectations of those subject to regulation, altering the regulations does not lower the degree of judicial deference. *Cf. Western Coal Traffic League v. United States*, 719 F.2d 772, 778 (5th Cir.1983) (en banc) ("[N]one can doubt that ICC's authority to change its mind in light of experience. . . . Certainly, regulatory agencies 'are neither required nor supposed to regulate the present and future within the inflexible limits of yesterday.' ").

With respect to agency adjudications, on the other hand, we recognize that interpretative inconsistency seriously undermines the presumption of validity. As we said in *NLRB v. International Union of Operating Engineers Local 925*, 460 F.2d 589 (5th Cir.1972), an agency "may not depart sub silentio from its usual rules of decision to reach a different, unexplained result in a single case." 460 F.2d at 604 (citing *Mary Carter Paint Co. v. FTC*, 333 F.2d 654 (5th Cir.1964)); *see Quarles v. St. Clair*, 711 F.2d 691, 706 (5th Cir.1983). Such inconsistency requires explanation, and judicial scrutiny of the grounds for the adjudication accordingly increases. *See generally* Note, *Judicial Review of Reversals of Policy by Administrative Agencies*, 68 Harv. L.Rev. 1251 (1955). With these standards in mind, we turn to the merits.

## IV.

Brackenridge first contends that the prospective cost limitations violate the Medicare statute as well as the Secretary's regulation defining the principles for setting such limitations. The hospital's argument essentially challenges the accuracy of the factors the Secretary employed in setting the limitations. Brackenridge argues, in other words, that "the factors utilized in the existing system are not valid proxies for other factors not considered." In its statutory attack, Brackenridge maintains that the prospective cost limitations deviated from the mandate of 42 U.S.C. § 1395x(v)(1)(A) (1976), which required the limitations to reflect the "reasonable cost" of providing services. The limitations did not comply with that requirement, the hospital alleges, because the Secretary used faulty predictors of reasonable costs. Of the three factors the Secretary employed—location of the hospital in a rural or urban area, number of beds, and per capita income in the vicinity of the hospital—only the first rationally predicted a hospital's costs. By failing to take account of variations among hospitals, therefore, the limitations contravened the intent of Congress in enacting section 1395x(v)(1)(A) to prevent

reimbursement only for provision of luxury services and for grossly inefficient operations.

■ We must agree, however, with the district court that Brackenridge did not carry its burden of demonstrating the irrationality of the cost limitations. Our review of the record shows that at best the hospital established that the Secretary could have used methodologies that possibly would more accurately have reflected costs of providing general routine inpatient services, at least for Brackenridge. Such a showing falls short of proving a lack of reasonable relation between the regulation and the legislative purpose.

In authorizing the Secretary to issue prospective limitations, Congress expressed its intent in very broad terms. The amendment of section 1395x(v)(1) represented an effort to discourage inefficiency and provision of unnecessary services while assuring reimbursement of reasonable costs. As the House Report stated, "it is undesirable from the standpoint of those who support Government mechanisms for financing health care to reimburse health care institutions for costs that flow from marked inefficiency in operation or conditions of excessive service." H.R.Rep. No. 231, 92d Cong., 1st Sess. 82, *reprinted in* 1972 U.S. Code Cong. & Ad. News 4989, 5069. Congress believed that prospective limitations would permit providers to adjust their practices so as to eliminate inefficiency and unnecessary amenities or care. Although the House Report recognized a number of factors that could influence costs, Congress left to the Secretary the difficult task of defining what constituted "reasonable cost".

The evidence shows that the 1975 cost limitations promoted the congressional purpose. The hospital's own expert admitted that a significant relationship existed between the factors the Secretary used and the variation in actual costs among providers of hospital services. Referring to the correlation between per capita income and costs, for example, the expert testified that "it is clear that there is some correlation; and my guess is, based on the evidence I have seen, that you could probably explain on the order of one-fourth of a total variation in costs by per capita income alone." He further stated that per capita income and number of beds together accounted for up to fifty percent of the cost variations. To the extent he criticized the Secretary's methodology, moreover, he focused on correlations between other factors and costs of hospitalization generally rather than between those factors and routine inpatient costs. Yet, routine costs by their nature exclude costs that arise from provision of various ancillary services. Consequently, as an expert for the Secretary testified, the other factors that Brackenridge's expert identified would not significantly enhance the accuracy of cost limitations for provision of routine inpatient services.[8] Expert testimony, therefore, supported rather than refuted the reasonableness of the limitations.

Brackenridge also contends, however, that actions by the Secretary after issuance of the 1975 limitations demonstrated their invalidity. The hospital points out that internal memoranda criticized per capita income and number of beds as predictors of costs and that revisions of the limitations in subsequent years substituted other factors for income and bed size. Changes in the rule suggested by studies in the Secretariat, however, do not persuade us that the factors the Secretary originally used departed impermissibly from the purpose underlying section 1395x(v)(1)(A). The Secretary altered the limitations in light of experience. Per capita income, number of beds, and location in an urban or rural area bore a rational relation to reasonable costs of providing routine inpatient services. Congress required nothing more of the Secretary. It is not for the courts to second-

---

8. The Secretary's expert stated that a given hospital's "mix" of cases and intensity of operation primarily affect the cost of providing non-routine inpatient services. He testified that "we will admit that there is an impact on the total cost of hospitalization, but this type of thing reflects itself in the so-called ancillary services more so than in the routine. . . ."

guess her merely if we might think ourselves capable of devising a superior scheme. *Batterton,* 432 U.S. at 425, 97 S.Ct. at 2405.

We find no merit in Brackenridge's further contention that the limitations violated the 1974 regulation, quoted at p. 5, which suggested five factors for the Secretary's consideration in developing limitations. The hospital argues that the Secretary should have embodied all five factors directly in the limitations. We see nothing in the regulation, however, requiring the Secretary to use even one of the factors. *See* 20 C.F.R. § 405.460(b) (1976) (providing that Secretary may classify providers "by such factors as the Secretary shall find appropriate and practical"). Her predecessor nonetheless employed two of them in developing the limitations, stating that use of the others would not appreciably enhance the accuracy of the limitations. *See* 40 Fed.Reg. 23,622–23 (1975). We accordingly uphold her interpretation of her own regulation.

### V.

The second aspect of Brackenridge's appeal focuses on its requests for a reclassification within the cost limitations scheme and for exceptions from the limitations. We dispose of the issues in turn.

#### A. *Reclassification*

■ The sizable number of college and graduate students residing in the Austin SMSA provide the grounds for Brackenridge's reclassification request. The hospital alleges that the data the Secretary used in classifying the Austin SMSA in the lowest per capita income group understated the actual income in the area. The distortion arose because students' purchasing power, which affects wages and prices in the SMSA, exceeds their nominal income in that their parents often supplement the funds available to them. The Secretary's failure to take account of this flaw in the data caused her to misclassify the Austin SMSA.

We believe that the logical implications of the argument go too far. The relevant regulation, on which Brackenridge relies, authorizes reclassification where the provider demonstrates that its original classification "is at variance with the criteria specified in promulgating limits under paragraph (d) of this section." 20 C.F.R. § 405.460(f)(1) (1976). The Secretary classified the Austin SMSA in Group V in reliance on statistics that the Department of Commerce published in its *Survey of Current Business. See* 40 Fed.Reg. 23,-622 (1975). Those data did not adjust per capita income to reflect the impact of student populations, although the *Survey* noted the students' distorting influence on the income figures. Brackenridge nonetheless contends that the Secretary should have revised the figures. Unless we intend to compel the Secretary to take account of all manner of "flaws" in income data, however, we must reject the hospital's argument.

We can readily conceive of numerous situations that might justify the special treatment of the kind that Brackenridge demands. A large number of migrant workers resident in an area, for example, might distort per capita income. A similar circumstance would arise where a locality sustains an extraordinary windfall because of a bumper crop or a World's Fair or suffers a catastrophic loss due to flood, freeze, or other natural disaster. Other examples come to mind, but the point is clear. The Secretary faithfully applied the per capita income criterion according to the data available. She had no obligation to correct statistical distortions.[9]

---

**9.** Brackenridge cites *Anna Jacques Hosp. v. Blue Cross Ass'n,* PRRB Hearing Dec. No. 79–D44, Medicare & Medicaid Guide (CCH) ¶ 30,025 (July 16, 1979), as evidence that the Secretary has granted reclassification in circumstances similar to the hospital's. We may readily distinguish that case, however. *Anna Jacques* involved a hospital in the conurbations surrounding Boston. Apparently because of the density of settlement in the area, the Department of Commerce developed for use in its *Survey of Current Business* a third category for New England localities. The PRRB allowed reclassification because the Anna Jacques Hospital lay in

B. *Exceptions*

Brackenridge further requested exceptions from the limitations on account of the costs flowing from its payment of wages and salaries in excess of those that other area hospitals paid, its strengthening of the security procedures, its development of a data processing system, and its provision of social services to the impecunious. Those costs, it contends, fall within the "atypical services" and "extraordinary circumstances" exceptions in 20 C.F.R. §§ 405.460(f)(2) and (3) (1976). The district court was not persuaded, nor are we.

Before reaching the particulars, however, we must resolve a preliminary issue. Brackenridge argues that the administrative tribunals and the district court improperly cast upon the hospital the burden of producing data on other hospitals in order to show the atypicality of its services and the extraordinary nature of its circumstances. We find no error in this allocation of the burden of production. The regulation requires the provider to demonstrate "that the conditions indicated are present." *Id.* § 405.460(f). That the Secretary maintains data on other hospitals does not immunize the provider from obtaining that information. Brackenridge says that it "understood" the Secretary would provide the data, but it does not suggest that it sought the information from her. The burden properly rested on Brackenridge; its failure to obtain data for comparison purposes does not taint the adequacy of the record.

■ Brackenridge did not demonstrate atypicality of the services it provided. As for its wage and salary claim, it does not argue that hospital employees performed unusual functions because of their larger income. Nor do we see that its extra security measures represented provision for routine inpatient services. The murder that prompted the increase in security occurred in the hospital emergency room, and Brackenridge does not suggest that other incidents of violence put inpatients at peril. In addition, we agree with the HCFA Administrator that an urban hospital almost inevitably suffers under the threat of such incursions. Development of a computer system and provision of social services to Austin and Travis County indigents fall under the same head. Brackenridge simply failed to show that providing those services satisfied the atypicality requirement.

■ The extraordinary circumstances exception similarly affords no relief. The regulation requires proof that the circumstances on which the provider relies lay "beyond the control of the provider". 20 C.F.R. § 405.460(f)(3) (1976). We find that Brackenridge's unusual employee expenses fell within its control in that the City of Austin, which owned and operated the hospital, set the higher wages and salaries. A private owner could hardly pay high wages and claim it had no control over them. We see no reason for a different result simply because a municipality owns the hospital.

We also perceive insufficient ground for characterizing Brackenridge's other circumstances as "extraordinary". As we have already said, security expenses represent an unhappy fact of life for urban hospitals. The same goes for delivery of social services to poor people. Pioneering a data processing capability also appears non-extraordinary in the context of routine inpatient services. We hold that the Secretary lawfully rejected Brackenridge's requests for exceptions.

## VI.

We sympathize with the plight of Brackenridge and similar institutions. Our decision may appear harsh in the context of one hospital, but regulation cannot be accomplished on a hospital-by-hospital basis.

an area that satisfied the Department of Commerce's criteria for an SMSA classification applicable to the rest of the United States. The decision thus stands for the proposition that the Secretary must employ the same criteria for determining the SMSA/non-SMSA classification of each locality. It does not mean that the Secretary must adjust data. We thus perceive no inconsistency in the Secretary's application of the regulation governing reclassifications.

The Secretary must make generalizations in achieving overall regulatory goals. It will always fall to some hospital to miss narrowly the more favorable classification or other category under the objective factors that the regulation employs. In this instance it was Brackenridge.

Our function, however, consists not in determining the subjective fairness of overall agency action in a specific situation but in assessing its legality. Because we find the Secretary's actions fall within the ambit of the power Congress conferred on her, we affirm the judgment of the district court.

AFFIRMED.