UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 96-2068

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

GOODLESS ELECTRIC CO., INC.,

Respondent.



ON APPLICATION FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD



Before

Torruella, Chief Judge, 

Bownes, Senior Circuit Judge, 

and Lynch, Circuit Judge. 



Jay M. Presser, with whom Skoler, Abbott & Presser, P.C. was 
on brief for respondent.
Susan M. Pavsner, Attorney, with whom Frederick L. 
Feinstein, General Counsel, Linda Sher, Associate General 
Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, 
and Howard E. Perlstein, Deputy Assistant General Counsel, 
National Labor Relations Board, were on brief for petitioner.



September 5, 1997


TORRUELLA, Chief Judge. In February 1994, Local Union TORRUELLA, Chief Judge. 

No. 7 of the International Brotherhood of Electrical Workers,

AFL-CIO ("Union") filed charges of unfair labor practices with

the National Labor Relations Board ("NLRB" or "Board") against

Defendant-Cross-Petitioner Goodless Electric Co. ("Goodless").

On March 2, 1995, an administrative law judge ("ALJ") issued a

decision finding no labor violations and recommending dismissal

of the charges. The NLRB General Counsel appealed to a panel of

the NLRB, which, on April 30, 1996, reversed certain of the ALJ's

findings as they relate to the issues relevant to this appeal and

determined that Goodless had violated provisions of the National

Labor Relations Act ("NLRA" or "Act"). See Goodless Elec. Co., 

321 N.L.R.B. 64 (1996). Before us are the Board's petition for

enforcement of its order and Goodless' petition for reversal of

the Board's conclusions of law. For the reasons stated herein,

we reverse and deny the Board's petition for enforcement of its

order.

BACKGROUND BACKGROUND

The background facts are essentially undisputed.

Goodless is a construction industry employer engaged in

electrical contracting. In June 1988, Goodless agreed to be

bound by an existing collective bargaining agreement between the

multi-employer National Electrical Contractors Association

("NECA") and the Union. In July 1990, Goodless became a

signatory to a new three-year collective bargaining agreement

between the NECA and the Union. The agreement authorized the

-2-

NECA to bargain with the Union on Goodless' behalf unless that

authority was withdrawn with 150 days' notice of cancellation.

The relationship entered into by Goodless and the Union at this

point constituted a Section 8(f)1 relationship under the NLRA.

Under Section 8(f), a construction industry employer may enter

into a relationship with a union whereby the union bargains on

behalf of the employer's employees prior to a showing that the

union has garnered the support of a majority of the employees.

The question on which the issues in this appeal hinge relates to

the circumstances under which a Section 8(f) relationship may
 

1 Section 8(f) of the Act, 29 U.S.C. 158(f) (1976), provides:

It shall not be an unfair labor practice
under subsections (a) and (b) of this section
for an employer engaged primarily in the
building and construction industry to make an
agreement covering employees engaged (or who,
upon their employment, will be engaged) in
the building and construction industry with a
labor organization of which building and
construction employees are members (not
established, maintained, or assisted by any
action defined in subsection (a) of this
section as an unfair labor practice) because
(1) the majority status of such labor
organization has not been established under
the provisions of section 159 of this title
prior to the making of such agreement, or (2)
such agreement requires as a condition of
employment, membership in such labor
organization after the seventh day following
the beginning of such employment or the
effective date of the agreement, whichever is
later. . . . Provided, That nothing in this
subsection shall set aside the final proviso
to subsection (a) (3) of this section:
Provided further, That any agreement which
would be invalid, but for clause (1) of this
subsection, shall not be a bar to a petition
filed pursuant to section 159(c) or 159(e) of
this title.

-3-

become a Section 9(a)2 relationship. Under Section 9(a), once a

union has become the representative of a majority of the

employees in an appropriate bargaining unit, the employer is

required to bargain with the union as the employees' bargaining

representative. The NLRB has held that Section 8(f) status may

change to Section 9(a) status by virtue of either a Board-

certified election or as the result of the employer's voluntary

recognition of the union as the majority collective bargaining

agent. Voluntary recognition requires the union's unequivocal

demand for, and the employer's unequivocal grant of, voluntary

recognition as the employees' collective bargaining

representative based on the union's contemporaneous showing of

majority employee support. See James Julian, Inc., 310 N.L.R.B. 

1247, 1252 (1993).

 

2 Section 9(a), 29 U.S.C. 159(a), provides:

Representatives designated or selected for
the purposes of collective bargaining by the
majority of the employees in a unit
appropriate for such purposes, shall be the
exclusive representatives of all the
employees in such unit for the purposes of
collective bargaining in respect to rates of
pay, wages, hours of employment, or other
conditions of employment: Provided, That any
individual employee or a group of employees
shall have the right at any time to present
grievances to their employer and to have such
grievances adjusted, without the intervention
of the bargaining representative, as long as
the adjustment is not inconsistent with the
terms of a collective-bargaining contract or
agreement then in effect: Provided further,
That the bargaining representative has been
given opportunity to be present at such
adjustment.

-4-

On June 18, 1992, Goodless notified NECA and the Union

that NECA was no longer authorized to negotiate on Goodless'

behalf and that Goodless did not intend to be bound by any

further contractual modifications or obligations beyond the then-

current agreement's expiration date of June 30, 1993. Thus,

Goodless indicated that any relationship between Goodless and the

Union would expire as of June 30, 1993.

In July 1992, a Union representative contacted

Goodless' president and indicated that Goodless would need to

sign a letter of assent.3 Goodless was told that the letter of

assent was needed in order for Goodless to continue receiving

"target money."4 Goodless' president reviewed the letter of

assent and deleted some language contained in the letter. He did

not, however, alter the following language:

The Employer agrees that if a majority of its
employees authorize the Local Union to
represent them in collective bargaining, the
Employer will recognize the Local Union as
the NLRA Section 9(a) collective bargaining
agent for all employees performing electrical
construction work within the jurisdiction of
the Local Union on all present and future
jobsites.

Goodless signed the letter of assent on July 15, 1992.

 

3 The 1988 NECA agreement required employer-members to sign a
letter of assent to be bound by the NECA agreement. Goodless did
not sign a letter of assent until 1992; this is the letter at
issue here.

4 Target money was financial assistance provided by the Union to
aid union employers in competition with non-union electrical
contractors.

-5-

At a meeting with Union representatives on June 22,

1993, Goodless' president again indicated that Goodless did not

intend to continue its relationship with the Union after June 30,

1993. The Union representatives encouraged Goodless to consider

changes regarding service work that NECA had accepted earlier

that month. The meeting ended with the participants agreeing to

meet on June 25.

On June 24, the Union's business agent, Douglas Bodman

("Bodman"), held a meeting of all Goodless employees. At this

meeting, he indicated the progress of negotiations with Goodless.

After informing the employees of Goodless' claim that the Union

lacked employee support, he asked the employees to sign

authorization cards as evidence of their desire for continued

representation. All employees signed the cards, which stated:

I authorize Local Union No. 7 of the
International Brotherhood of Electrical
Workers to represent me in collective
bargaining with my present and future
employers on all present and future jobsites
within the jurisdiction of the Union. This
authorization is non-expiring, binding and
valid until such time as I submit a written
revocation.

At the second meeting, on June 25, between Goodless and

the Union, Goodless maintained that the company's relationship

with the Union would end with the expiration of the agreement.

In response, Bodman presented the authorization cards signed by

all Goodless employees. Goodless' president tossed the cards

back at Bodman, telling him that he could "shove them up [his]

ass." Another Union representative calmed tensions and secured

-6-

from Goodless a six-month extension of the 1990-1993 contract by

promising certain terms for Goodless.

On December 13, Goodless informed the Union that it

intended to withdraw recognition of the Union upon the

approaching December 31 expiration date. On December 17,

Goodless sent a letter to all employees indicating these

intentions and inviting the employees to discuss the matter with

Goodless management prior to December 23.

On December 21, the Union responded with two letters

reminding Goodless of the language contained in the letter of

assent that bound Goodless to recognize the Union as the Section

9(a) collective-bargaining representative on a showing of

majority support and indicating that, the Union having made such

a showing at the June 25 meeting, the Union was now the Section

9(a) bargaining representative and Goodless could not repudiate

the relationship or negotiate directly with its employees.

Union Business Manager Bodman composed a form letter

for the employees to send to Goodless in response to Goodless'

December 17 letter. All but one Goodless employee signed and

submitted this form letter, which stated in relevant part:

I intend to continue my employment with
Goodless Electric and maintain my membership
with [the Union]. I expect you to continue
to comply with my union contract and maintain
the current wages and terms and conditions of
employment.

If you need to discuss any matter
concerning wages or terms and conditions of
employment, contact my Union Representative
Douglas Bodman.

-7-

On December 30, Goodless announced new terms of

employment to take effect January 1, 1994. On January 1,

Goodless also ceased to recognize the Union as the employees'

collective bargaining agent.

Because Goodless was no longer a signatory to the NECA

agreement, the apprentices working for Goodless were informed by

the Joint Apprentice Training Committee (JATC)5 on January 6,

1994, that they would be subject to termination from the

apprenticeship program if they continued to work for Goodless.

As a result, the apprentices terminated their employment with

Goodless en masse.

As a result of these unilateral modifications, the

Union filed charges of unfair labor practices with the NLRB,

alleging that the relationship between the Union and Goodless had

been transformed from a Section 8(f) relationship into a Section

9(a) relationship upon the Union's showing of majority support in

June 1993. Because the relationship was allegedly one under

Section 9(a), the Union argues that Goodless was obligated to

bargain with it as the employees' representative. The Union

contends that by withdrawing recognition of the Union as the

employees' collective bargaining agent and unilaterally changing

the terms and conditions of employment, Goodless violated Section
 

5 Under the NECA collective-bargaining agreement, the Joint
Apprentice Training Committee ran an apprenticeship program
consisting of three members of the Union and three members of the
contractors' association. To be eligible to train apprentices,
an employer had to "be signatory to and meet the qualifying
requirements as set forth in the basic labor agreement and
provide the necessary work experience for training."

-8-

8(a)(5)6 of the National Labor Relations Act. The Union also

insists that Goodless constructively discharged the apprentices

in violation of Section 8(a)(3).7
 

6 Section 8(a)(5), 29 U.S.C. 158(a)(5), provides:

It shall be an unfair labor practice for an
employer --

(5) to refuse to bargain collectively with
the representatives of his employees, subject
to the provisions of section 159(a) of this
title.

7 Section 8(a)(3), 29 U.S.C. 158(a)(3), provides:

It shall be an unfair labor practice for an
employer --

(3) by discrimination in regard to hire or
tenure of employment or any term or condition
of employment to encourage or discourage
membership in any labor organization:
Provided, That nothing in this subchapter, or
in any other statute of the United States,
shall preclude an employer from making an
agreement with a labor organization (not
established, maintained, or assisted by any
action defined in this subsection as an
unfair labor practice) to require as a
condition of employment membership therein on
or after the thirtieth day following the
beginning of such employment or the effective
date of such agreement, whichever is the
later, (i) if such labor organization is the
representative of the employees as provided
in section 159(a) of this title, in the
appropriate collective-bargaining unit
covered by such agreement when made, and (ii)
unless following an election held as provided
in section 159(e) of this title within one
year preceding the effective date of such
agreement, the Board shall have certified
that at least a majority of the employees
eligible to vote in such election have voted
to rescind the authority of such labor
organization to make such an agreement:
Provided further, That no employer shall

-9-

The case was first heard before an ALJ, who determined

that the relationship between Goodless and the Union did not

change to a Section 9(a) relationship. Because the relationship

remained a Section 8(f) relationship, Goodless remained free to

repudiate the relationship at the end of the contractual term and

thus its unilateral changes to the terms and conditions of

employment did not violate either Section 8(a)(3) or Section

8(a)(5).

The NLRB reversed the ALJ's opinion in ruling that,

under existing NLRB case law, the relationship between Goodless

and the Union changed from a Section 8(f) relationship to a

Section 9(a) relationship upon the Union's presentation to

Goodless of the employee-signed authorization cards. The Board

held that the letter of assent signed by Goodless in June 1992,

in which it stated that, should the Union garner majority

support, Goodless would recognize the Union as the Section 9(a)

employee representative, amounted to a standing promise to extend

such recognition conditioned only on the Union's showing of

majority support. When the Union showed majority support through
 

justify any discrimination against an
employee for nonmembership in a labor
organization (A) if he has reasonable grounds
for believing that such membership was not
available to the employee on the same terms
and conditions generally applicable to other
members, or (B) if he has reasonable grounds
for believing that membership was denied or
terminated for reasons other than the failure
of the employee to tender the periodic dues
and the initiation fees uniformly required as
a condition of acquiring or retaining
membership.

-10-

the authorization cards in June 1993, the Board reasoned, the

condition had been met and Goodless was bound by its earlier

promise to recognize the Union as the Section 9(a) employee

representative. The Board then found violations of Section

8(a)(3) for Goodless' withdrawal of recognition of the Union and

of Section 8(a)(5) for constructive discharge of the four

apprentices. The Board ordered Goodless to cease and desist, and

also ordered that Goodless: recognize the Union as the exclusive

bargaining agent of its journeymen electricians and apprentices;

rescind changes in employment terms made on and after December

31, 1993; and make whole all employees who worked for it on and

after December 31, 1993, for any loss of wages and other benefits

suffered with interest, make whole any fringe benefit funds, and

reimburse employees for any losses or expenses they may have

incurred because of Goodless' failure to make payments to those

funds. Finding that the NLRB misapplied its own precedent in

this case, we deny enforcement of its order.

STANDARD OF REVIEW STANDARD OF REVIEW

We determine whether the Board's decision correctly

applies the law and whether it is supported by substantial

evidence on the record. See Yesterday's Children, Inc. v. NLRB, 

115 F.3d 36, 44 (1st Cir. 1997); see also Universal Camera Corp. 

v. NLRB, 340 U.S. 474, 488 (1951). "We must sustain inferences 

that the Board draws from the facts and its application of

statutory standards to those facts and inferences as long as they

are reasonable." NLRB v. Laverdiere's Enter., 933 F.2d 1045, 

-11-

1050 (1st Cir. 1991). The standard is quite deferential, and

does not allow us to displace the Board's choice between two

conflicting views merely because we may "justifiably have made a

different choice had the matter been before [us] de novo." 

Universal Camera Corp., 340 U.S. at 488. This standard, however, 

is no rubber stamp: We must set aside a Board decision if we

cannot fairly find that it is either supported by substantial

evidence in the record, id., or correctly applies the relevant 

law, Shaw's Supermarkets v. NLRB, 884 F.2d 34, 35-37 (1st Cir. 

1989); see also Laverdiere's Enter., 933 F.2d at 1050 ("The 

courts of appeals are charged with 'responsibility for the

reasonableness and fairness of Labor Board decisions,' and a

court must set aside Board action when it 'cannot conscientiously

find that the evidence supporting that decision is substantial,

when viewed in the light the record in its entirety furnishes,

including the body of evidence opposed to the Board's view.'"

(citations omitted) (quoting Universal Camera Corp., 340 U.S. at 

488, 490)).

DISCUSSION DISCUSSION

I. Statutory structure I. Statutory structure

Section 9(a), 29 U.S.C. 159(a), of the National Labor

Relations Act designates the manner in which a union becomes the

exclusive bargaining representative of a unit of employees. A

representative selected by a majority of the employees in a unit,

to which the section applies, shall be the employees' exclusive

bargaining representative. See 29 U.S.C. 159(a). Generally, 

-12-

it is a violation of Section 8(a) of the NLRA for an employer to

treat a union as the exclusive bargaining representative of its

employees prior to that union's being designated as such by a

majority of the employees. See 29 U.S.C. 158(a) & (f). 

The construction industry, however, tends to employ

workers for short durations and on discrete projects, making the

designation or selection of a union representative difficult.

See generally S. Rep. No. 86-187 (1959). To remedy this problem 

and allow construction workers collective bargaining

representation, Congress enacted Section 8(f) of the NLRA. See 

id. Section 8(f) essentially provides an exception to the 

prohibitions on employer recognition of a non-majority

representative in the construction industry. Section 8(f) allows

a construction industry employer to enter into a specific

agreement of limited duration with a union whereby the union acts

as the employees' collective bargaining agent. See 29 U.S.C.  

158(f). Employees are allowed, however, to petition for the

selection of a different agent as their representative. Id. 

II. Board precedent II. Board precedent

Prior to the Board's decision in John Deklewa & Sons, 

Inc., 282 N.L.R.B. 1375 (1987), Board precedent held that a 

Section 8(f) relationship could change to a Section 9(a)

relationship under the "conversion doctrine." The conversion

doctrine required only a union's showing of majority support at

some point during the relevant period to convert a Section 8(f)

relationship into a Section 9(a) relationship. "The achievement

-13-

of majority support required no notice, no simultaneous union

claim of majority, and no assent by the employer to complete the

conversion process." Id. at 1378. Upon such conversion, the 

employer was required under Section 9(a) to recognize the union

as the employees' exclusive bargaining agent. Id. at 1379. The 

conversion created an irrebuttable presumption of majority status

for the duration of the agreement. Id. 

Along came Deklewa, however, in which the Board 

overturned its "conversion doctrine," on the ground that it did

not serve the "statutory objectives of employee free choice and

labor relations stability." Id. In its place, the Board 

established four cardinal principles to govern this area:

(1) a collective-bargaining agreement
permitted by Section 8(f) shall be
enforceable through the mechanisms of Section
8(a)(5) and Section 8(b)(3); (2) such
agreements will not bar the processing of
valid petitions [for a Board-certified
election] filed pursuant to Section 9(c) and
Section 9(e); (3) in processing such
petitions, the appropriate unit normally will
be the single employer's employees covered by
the agreement; and (4) upon the expiration of
such agreements, the signatory union will
enjoy no presumption of majority status, and
either party may repudiate the 8(f)
bargaining relationship.

Id. at 1377-78. As part of the new structure, neither an 

employer nor a union who is a party to Section 8(f) agreements

may unilaterally repudiate their relationship during the express

period of the agreement. Id. at 1387. The Board also determined 

that, at no time during the duration of the agreement does the

-14-

union enjoy a presumption, rebuttable or otherwise, of majority

status. Id. 

Because of the unique situation in which a Section 8(f)

relationship arises, Board case law since Deklewa has set forth 

only two means by which a union may obtain Section 9(a) status

during the course of a Section 8(f) relationship: (1) through a

Board-certified election, or (2) through an employer's voluntary

grant of recognition of the union as the employees' exclusive

majority bargaining agent. Unless and until a relationship is

proved to be otherwise, a bargaining relationship between a

construction industry employer and a union is presumed to be 8(f)

rather than 9(a). See Comtel Sys. Technology, 305 N.L.R.B. 287, 

289 (1991). The burden of proving a 9(a) relationship rests on

the party asserting its existence. Casale Indus., 311 N.L.R.B. 

287, 288 (1993). Because the Board determined below that the

Union had met its burden of proving that Goodless granted it

voluntary recognition, we focus our inquiry on the latter ground.

The NLRB has held that "a party may prove the existence

of a 9(a) relationship . . . through . . . a union's express

demand for, and an employer's voluntary grant of, recognition to

the union as bargaining representative based on a contemporaneous

showing of union support among a majority of the employees in an

appropriate unit." J & R Tile, Inc., 291 N.L.R.B. 1034, 1036 

(1988). There must be "positive evidence" that the "union

unequivocally demanded recognition as the employees' 9(a)

-15-

representative and that the employer unequivocally accepted it as

such." Id. 

The cases in which the Board has applied this approach

fall into two categories, the first finding that the acts of the

union and the employer transformed their Section 8(f)

relationship into a Section 9(a) relationship, and the second

determining that the parties failed to meet the requirements for

such a transformation. A consistent theme running throughout the

cases in the first category is the requirement that all of the

following three parts of the voluntary recognition test be met:

(1) the union must expressly and unequivocally demand recognition

as the employees' Section 9(a) representative; (2) the employer

must expressly and unequivocally grant the requested recognition;

and (3) that demand and recognition must be based on a

contemporaneous showing that the union enjoys majority support of 

the employers' workforce.

Board case law emphasizes that the third requirement is

essential. In addition to an actual showing of majority support

through the presentation of employee-signed authorization cards

to an employer, see Hayman Electric, 214 N.L.R.B. 879, 886 

(1994), or through an employer-conducted poll prior to initial

recognition, see Precision Piping, 284 N.L.R.B. 1110, 1112 

(1987), the Board has found as sufficient to satisfy the third

requirement a union's claim of majority support that went

unchallenged by the employer for a period of more than six

months. See, e.g., Triple A Fire Protection, Inc., 312 N.L.R.B. 

-16-

1088, 1089 (1993) (declining to question whether the union

actually achieved the majority status it claimed at the time the

employer recognized it when the challenge to such status came

over four years after the agreement); Casale Indus., 311 N.L.R.B. 

951, 953 (1993) (refusing to permit employer's challenge to

union's majority status arising six years after the union claimed

to have obtained that status and limiting the window for

challenge to six months from the time majority status is

claimed); Golden West Elec. Co., 307 N.L.R.B. 1494, 1495 (1992) 

(holding that employer's act of reading and signing, and later

acknowledging its agreement with, a letter stating that the union

represented a majority of employees was sufficient showing of the

union's majority status to find a Section 9(a) relationship).

Similarly, the Board found the third requirement to be met where

an employer's admission or acknowledgement that the union enjoyed

majority support among its employees was given contemporaneously

with the demand for recognition and was provided without further

inquiry into the union's actual status. See Golden West Elec., 

307 N.L.R.B. at 1495 (relying on the employer's admission of

majority status to satisfy the burden of showing Section 9(a)

status). From this case law it is clear that when a union claims

it has attained majority status and the parties, based on that

claim, agree to a Section 9(a) relationship, the employer must

challenge that status within a reasonable period of time (six

months), or be bound by its agreement.

-17-

The Board has also held that notwithstanding the

parties' intention to enter into a Section 9(a) relationship,

their relationship is not entitled to Section 9(a) status if the

union has not actually achieved majority status prior to the time

of the demand. See Comtel Sys. Tech., 305 N.L.R.B. 287, 289 

(1991) (determining no Section 9(a) relationship would be

established unless union made a showing of majority support of

single-unit employer's employees prior to that employer's entry

into a multi-employer bargaining relationship claimed to be

governed by Section 9(a)); see also J & R Tile, 291 N.L.R.B. at 

1037 (declining to find that predecessor employer and union had

entered into Section 9(a) relationship where no showing was made

that the union had obtained majority support at the time of the

parties' agreement and no indication was presented that the

parties intended a Section 9(a) relationship); James Julian, 

Inc., 310 N.L.R.B. at 1253 (describing the finding regarding the 

predecessor employer in J & R Tile as based on the lack of 

evidence that "the collective-bargaining agreement was entered on

the basis of a demonstrated showing of the union's majority").

Thus, Board precedent indicates that the union's demand for and

the employer's grant of recognition must be predicated on at

least an unchallenged claim, if not an actual showing, of

contemporaneous majority support.8 
 

8 In fact, the Board's General Counsel has noted its
understanding of Deklewa and progeny as providing that failure to 
show majority support at the time of the demand will defeat any 
attempts at a Section 9(a) relationship. The General Counsel
interpreted Deklewa and progeny as holding that, "to prove that a 

-18-

Applying these principles to the undisputed facts in

the instant appeal, we simply cannot find that the requirements

set forth by the Board in Deklewa and subsequent cases have been 

satisfied. Quite simply, the requirement that a demand and

recognition be based on a contemporaneous showing of majority 

support was never satisfied. The record does not support the

conclusion that, when the Union presented the letter of assent to

Goodless in June 1992, in which it allegedly sought Goodless'

recognition, it made a contemporaneous claim of majority support

on which Goodless' recognition of the union's majority status 

could be made.9 A showing of majority support at least a year
 

relationship in the construction industry is a Section 9
relationship, there must be (1) a union demand to be recognized
as the Section 9 representative; (2) an employer acceptance of
the union's demand; and (3) majority status at the time of such
demand and acceptance." Advice Ltr. from NLRB Gen. Counsel to
Regional Director of Region 9, Feb. 27, 1989, 1989 WL 241614, at
*2 (Feb. 27, 1989). In determining that, under the facts
presented to it, no Section 9(a) relationship could be found
because "there has been no showing that the Union represents a
majority of the employees in the appropriate unit," it noted:

Even if the Union does, in fact, represent a
majority of the Employer's employees, J & R 
Tile makes clear that there must be explicit 
proof presented contemporaneously with the
Union's demand and the Employer's voluntary
recognition. Thus, although the Employer's
ambiguous statements arguably may indicate
that it believed the Union had majority
support, those statements are insufficient to
confer 9(a) status upon the Union without
actual demonstration of that majority status.

Id. 

9 In its brief, the Board suggests that Decorative Floors, Inc., 
315 N.L.R.B. 188, 189 (1994), and Hayman Electric, Inc., 314 
N.L.R.B. 879, 887 n.8 (1994), support the opposite conclusion
regarding the requirement of a showing of majority support.

-19-

later can hardly be considered a showing made contemporaneously

with, and as a prerequisite to, the Union's demand for

recognition.

Moreover, the cases that presume majority support still

require contemporaneity. The record raises serious doubts

regarding whether Goodless in fact conceded that the Union had

obtained majority support. The Board concluded that Goodless'

unartful statement at the June 25 meeting was evidence of its

recognition of the union's majority status. Even assuming that

the Board's interpretation of the meaning of Goodless' statement

is sound, its case law unmistakably holds that nevertheless the

showing of majority status must be contemporaneous with the

demand and recognition of that status. These preconditions to a

9(a) recognition are clearly lacking here.

In arriving at its conclusion, the Board relied upon

principles of contract law. See Goodless Elec. Co., 321 N.L.R.B. 

at 66. In discussing Goodless' signing of the letter of assent,

the Board suggests that "the letter of assent constituted, for

the remainder of its term, both a continuing request by the Union

for 9(a) recognition and a continuing, enforceable promise by the

Respondent [Goodless] to grant voluntary recognition on that

 

While the Board is quite correct that neither of these opinions
required that the union demonstrate through extrinsic evidence
the existence of majority support, they were not so required
because in Hayman Electric, the union had made a claim of 
majority support, which the employer failed to challenge, and in
Decorative Floors, the employer had signed a recognition 
agreement explicitly stating that the union had attained majority
status. The same is not true here.

-20-

basis if the Union demonstrated majority support." Id. On this 

point, we have noted that "[t]he prevailing rule, in this and

other circuits, provides that technical rules of contract

interpretation are not necessarily binding on the Board in the

collective bargaining context, even though it is free to apply

general contract principles so as to foster the established

federal labor policy favoring collective bargaining." NLRB v. 

Boston Dist. Council of Carpenters, 80 F.3d 662, 665 (1st Cir. 

1996). Furthermore, it is clear that general contract law

principles cannot supplant the requirement of a federal labor

policy such as that embodied in Section 9(a) requiring that

employees be represented by an organization approved by a

majority of employees.

In the unique circumstances surrounding a Section 8(f)

relationship between a construction industry employer and a

union, for ten years the Board has followed a specific and

discrete two-option rule for the transformation of that

relationship into a Section 9(a) relationship. Under the plain

terms of that rule, a finding in favor of Goodless is required.

We cannot accept the Board's departure from its own precedent in

this case in the absence of some cogent explanation, an

explanation that has not been forthcoming.10 See Shaw's 

Supermarkets, Inc., 884 F.2d at 35 ("Although the Board is not 

permanently bound by its precedent, when it wishes to deviate

 

10 Indeed, the Board does not acknowledge that its decision is a
departure from past precedent.

-21-

from well-established precedent as significantly as it has done

here, it must, at least, explain the reasons for its

deviation.").11 Under Board precedent, the parties maintained a

Section 8(f) relationship because no contemporaneous showing of

majority support accompanied the Union's demand to Goodless.

Thus, Goodless did not violate Section 8(a)(5) by repudiating

that relationship or by unilaterally changing the terms and

conditions of employment under the circumstances of this appeal.

As a final matter, the Board's finding that the

apprentices were constructively discharged rested upon its

conclusion that Goodless committed unfair labor practices by

repudiating its relationship with the Union, and by unilaterally

implementing changes in the terms and conditions of employment.

Because we do not agree with that finding, we cannot enforce a

ruling predicated upon it. We therefore deny enforcement of the

Board's finding that Goodless violated Sections 8(a)(3) and (1)

by constructively discharging the apprentices.

CONCLUSION CONCLUSION

For the foregoing reasons, we reverse and remand to the reverse remand 

National Labor Relations Board for proceedings in accordance with

this opinion.

 

11 As a secondary matter, we do not think that the Union's
demand, let alone Goodless' recognition, could be considered
"unequivocal" when it was subject to a contingency whose
fulfillment had no temporal limitations. Indeed, the contingency
may never have been met. Without any reasonable, temporally
limiting principles, we cannot affirm the Board's conclusion that
a demand and recognition may be properly considered unequivocal
when subject to a contingency whose fulfillment may never occur.

-22-

Costs to respondent.

-23-